UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| PAULA G.S.,<br><br>                Plaintiff,<br><br>     vs.<br><br>ANDREW SAUL, Commissioner of the<br>Social Security Administration,<br><br>                Defendant. | 4:20-CV-04041-VLD<br><br><br>MEMORANDUM OPINION<br>AND ORDER |

**INTRODUCTION**

Plaintiff, Paula G.S., seeks judicial review of the Commissioner's final decision denying her application for Supplemental Security Income benefits under Title XVI of the Social Security Act.

Ms. G.S. has filed a complaint and motion to reverse the Commissioner's final decision denying her disability benefits and to remand the matter to the Social Security Administration for further proceedings.  See Docket Nos. 1, 17.  The Commissioner has filed his own motion seeking affirmance of the decision at the agency level.  See Docket No. 21.

This appeal of the Commissioner's final decision denying benefits is properly before the court pursuant to 42 U.S.C. § 1383(c)(3).[1]  The parties have

---

[1] Section 1383(c)(3) provides that the final determination of the Commissioner as to an application for Title XVI benefits shall be subject to judicial review as provided in 42 U.S.C. § 405(g) and to the same extent as § 405 authorizes review of final determinations as to applications for social security disability benefits under Title II of the Social Security Act.  The court references standards of review under § 405 where appropriate herein.

consented to this magistrate judge handling this matter pursuant to 28 U.S.C.
§ 636(c).

## FACTS[2]

### A.    Statement of the Case

This action arises from Ms. G.S.'s application for Supplemental Security
Income (SSI) with a protected filing date of December 28, 2016, alleging
disability starting September 1, 2014, due to diabetes, depression,
hypertension, high blood pressure, sclerosis, arthritis, degenerative bones,
nerve damage, muscle stiffness, and bone spurs.  T267, 311, 323, 328.
Ms. G.S. stated in her Function Report, completed with her application
process, that her conditions affected her ability to lift, reach, use her hands,
squat, bend, stand, walk, sit, kneel, complete tasks, concentrate, and
remember things.  T328.

Ms. G.S.'s claims were denied at the initial and reconsideration levels,
and Ms. G.S. requested an administrative hearing.  T200, 207, 214.

Ms. G.S.' administrative law judge (ALJ) hearing was held on November
8, 2018, where a different attorney than her attorney of record in this appeal
represented Ms. G.S.  T125.  The ALJ issued an unfavorable decision on
February 4, 2019.  T101.

---

[2] These facts are recited from the parties' stipulated statement of facts (Docket
No. 16).  The court has made only minor grammatical and stylistic changes.
Citations to the appeal record will be cited by "T" followed by the page or pages.

At step one of the evaluation, the ALJ found that Ms. G.S. had not engaged in substantial gainful activity since December 28, 2016, the application date.  T106.

At step two, the ALJ found that Ms. G.S. had severe impairments, including diabetes; obesity; chronic bilateral L5 spondylosis with severe lateral recess and neural foraminal stenosis at L5-S1; osteoarthritis of the knees; mild thoracic degenerative disc disease; major depressive disorder; and post-traumatic stress disorder (PTSD).  T106.  The ALJ found that each of those impairments significantly limited Ms. G.S.'s ability to perform basic work activities.  T107.  The ALJ found that each of those impairments more than minimally limited Ms. G.S.'s mental and physical abilities to do basic work activities.  T107.

The ALJ also found that Ms. G.S. had additional non-severe impairments (hypertension, carpal tunnel syndrome that was moderately severe on the right and mild on the left, and right ulnar neuropathy at the elbow) that caused no more than minimal impact on her ability to carry out work-related activities T107.

The ALJ found that Ms. G.S.'s alleged arthritis in the shoulders was not documented in the medical evidence from an acceptable medical source; therefore, it was not a medically determinable impairment.  T107.  The ALJ also noted that an MRI had reported multiple sclerosis (MS), but the interpreting neurologist had stated nothing in the record supported a diagnosis of MS.  The ALJ asserted in the decision that Ms. G.S. admitted at the hearing

3

that while the MRI showed abnormal white spots, she knew she did not have

MS or a diagnosis of MS.  T107.  The ALJ then concluded that Ms. G.S.'s

alleged MS was not a medically determinable impairment.  T107.

In step three, the ALJ found that Ms. G.S. did not have an impairment

that meets or medically equals a listing.  T107-08.  The ALJ found that

Ms. G.S. did not meet Listing 1.04A because radiological evidence did not

support that the nerve root or spinal cord had been compromised.  T107.  The

ALJ found that Ms. G.S. had mild limitations in understanding, remembering,

or applying information; moderate limitations in interacting with others;

moderate limitations in concentrating, persisting, or maintaining pace; and,

mild limitations in adapting or managing oneself.  T108.  The ALJ stated that

those findings were not a residual functional capacity assessment and the

mental residual functional capacity assessment used in steps four and five

required a more detailed assessment.  T108.

The ALJ determined that Ms. G.S. had residual functional capacity,

(RFC), to:

> perform less than the full range of light work . . . .
> Specifically, she can lift and/or carry 20 pounds occasionally
> and 10 pounds frequently.  She can sit for about 6 hours in
> an 8-hour workday, but would need an opportunity to stand
> up and/or change position at her workstation for
> approximately 2-3 minutes after sitting for an hour.  After
> using that opportunity, the claimant can return again to a
> seated position and continue in that fashion for the remainder
> of the 8-hour workday.  She can stand and/or walk combined
> for about 6 hours in an 8-hour workday.  The claimant can
> never climb ladders, ropes, or scaffolds, but can occasionally
> climb ramps and stairs using a handrail.  She can
> occasionally balance, stoop, and crouch, and rarely (defined
> as 1-5% of a workday) kneel and crawl.  She should have no

> exposure to work around hazards, such as unprotected heights and fast and dangerous moving machinery.  Mentally, the claimant can perform simple tasks and maintain concentration, persistence and pace for 2-hour work segments.  The claimant can respond appropriately to brief and superficial interactions with co-workers and the general public throughout an 8-hour workday.

T109.

The ALJ found that Ms. G.S.'s impairments could reasonably be expected to cause the symptoms alleged by Ms. G.S., however her statements concerning the intensity, persistence and limiting effects of those symptoms were "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."  T110.

The ALJ found at step four that Ms. G.S. could not perform her past relevant work as a bus monitor and home health aide.  T114.

The ALJ found at step five, relying on the testimony of a vocational expert (VE), that Ms. G.S. could perform the occupations of bench assembler, Dictionary of Occupational Titles (DOT) # 706.687-010; electronics worker, DOT# 726.687-010; and molding machine tender, DOT# 556.685-022, relying on the number of jobs available "nationally"[3] for each occupation.  T115.

The ALJ considered the opinions of the State agency medical consultants and gave them "some weight" because the ALJ asserted evidence admitted at

---

[3] The parties' joint statement of material facts reads "in the national economy" here.  See Docket No. 16 at p. 4, ¶ 12.  However, the ALJ's decision indicates only that these numbers relate to the incidence of these jobs "nationally." T115.  The difference between these terms, as they are used in the context of social security determinations, is at issue in this case.  See Discussion section D.3. herein.  The court clarifies what verbiage the ALJ used in the interest of avoiding confusion.

the hearing level showed Ms. G.S. was more limited than determined by the agency consultants and required a sit/stand option secondary to chronic back and knee pain.  T114.  The ALJ stated she afforded the opinions weight to the "extent they support the physical residual capacity assessments as set forth above."  T113-14.

The ALJ considered the opinions of the State agency psychological consultants and rejected their finding that Ms. G.S. had no severe mental impairments.  T114.

The ALJ considered the statements of Jodi Williams, LPC-MH, and found she was not an acceptable medical source and gave her statements only "partial weight."  T113.  Ms. Williams identified marked limitations in some areas, and the ALJ asserted the marked limitations were inconsistent with Ms. G.S.'s relatively intact mental status examination observations as well as her intact activities of daily living and sporadic mental health treatment.  T113.

The Appeals Council denied Ms. G.S.'s request for review making the ALJ's decision final, and Ms. G.S. timely filed this action.  T1-7.

**B.**     **Relevant Medical Evidence in Chronological Order:**

    **1.**     **Evidence Before the December 28, 2016, Filing Date**

Ms. G.S. was seen at Rosebud Health Care on August 4, 2015, for left knee pain and diabetes check, and she reported a history of bone spurs in her knee with related pain.  She said she had been receiving steroid injections, most recently in April 2015.  T522.  She requested an orthopedic referral.  T522.  Ms. G.S. received another steroid injection in her left knee.  T527.

6

Barbara J. Howard, N.P., saw Ms. G.S. at Rosebud Health Care on September 1, 2015, when Ms. G.S. sought pain medications, a diabetes check, and an employment physical.  T519.  She reported having knee problems for 1½ years and said she had not been able to work during that time.  T519.  N.P. Howard asked Ms. G.S. if "she [had] been released by her physician to work, she told me 'yes.'"  T519.  However, N.P. Howard could not find the release.  T520.  Examination revealed Ms. G.S. was disheveled, very controlling, manipulative, and ambulating with a limp due to knee pain.  T521.  N.P. Howard did not perform a physical because Ms. G.S. was upset because N.P. Howard could not release her to work with a knee injury absent an orthopedist's release.  T521.  N.P. Howard prescribed hydrocodone for pain.  T521.

Madison W. Patrick, M.D., saw Ms. G.S. at Rosebud Emergency Room on October 20, 2015, for severe left knee pain, and a left knee x-ray revealed tricompartmental osteoarthritis greatest in the patellofemoral compartment with severe joint space narrowing and large osteophyte formation.  T593, 1009.  In the "Subjective" section of the medical note it stated, Ms. G.S.'s "pain was so severe that she was unable to walk without severe pain" and she needed a walker or other assistive device to walk.  T1009.

In November 2015, Ms. G.S. went to the Flandreau Clinic to establish care after moving to be closer to her daughter to help her with her new baby T699.  N.P. Drago described Ms. G.S. as having a normal mood and affect T700.  Ms. G.S. was told she could receive care and medications at the clinic,

7

but since she was not a resident of the county, any referrals would not be covered. T700. Also, Ms. G.S. would not be able to receive any narcotic medications at the clinic. T700.

Ms. G.S. was seen at the emergency room for hyperglycemia on December 26, 2015, and reported headache, nausea, feeling sweaty and clammy, and having fatigue, and blurry vision. T626, 628, 629. Her blood sugars were 458 that afternoon. T626.

X-rays obtained on April 5, 2016, of Ms. G.S.'s lumbosacral spine, revealed grade 1 spondylolisthesis of L5 on S1 with marked disc narrowing and sclerosis at that level, moderate degenerative changes in facet joints from L3 through S1 level, and slight anterior osteophyte formation. T829-30.

Ms. G.S. was seen at the Flandreau Counseling Center by Clay Pavlis, M.D., on June 30, 2016, with increasing intense anxiety and her PHQ-9[4] score was 23 (or 24 (T663)) endorsing anhedonia, feeling down and depressive, struggling with hopelessness, helplessness, worthlessness as well as issues with concentration, psychomotor agitation, and panic attack type symptoms. T659. Ms. G.S.'s GAD-7 score was 20, indicating severe anxiety. T663. Her chronic conditions included obesity, diabetes, dyslipidemia, hypertension, GERD, chronic low back pain, and osteoarthritis. T659-60. Dr. Pavlis' mental status exam revealed she was alert, oriented, in no acute distress; affect was mood congruent, labile, and highly anxious; and her insight

---

[4] PHQ-9 scores range from 0 to 27 with a score of 15-19 indicating moderate depression and 20 and above indicating severe depression. https://www.pcpcc.org/sites/default/files/resources/ instructions.pdf at p. 7.

and judgment were fair.  T660.  Ms. G.S. was found to have PTSD, given her nightmares, flashbacks, avoidance, history of trauma, impaired stress response, hypervigilance, impaired concentration, and recurrent major depression.  T660-61.

Grisel Rodriguez-Diaz, M.D., saw Ms. G.S. at Wagner Indian Health on July 7, 2016, for diabetes, and degenerative disease of the spine and left knee. T765.  Dr. Rodriguez-Diaz stated her diabetes was uncontrolled and Ms. G.S. was unable to afford healthy meals.  T765.  Dr. Rodriguez-Diaz wrote that Ms. G.S. required a total knee replacement with care through Orthopedic Institute, and because of that she was unable to work.  T765.

Ms. G.S. was seen at Orthopedic Institute on July 28, 2016, with ongoing knee symptoms and was frustrated that nonoperative treatment had failed and wished to proceed with total knee arthroplasty.  T679.  Ms. G.S. had been receiving injections for osteoarthritis of her left knee shown by exam and x-ray since October 2015.  T680-82.  Ms. G.S.'s BMI in January 2016 was 35.1 when seen at Orthopedic Institute.  T683.

Dr. Rodriguez-Diaz saw Ms. G.S. at Wagner Indian Health on November 10, 2016, for pain in her back, hips, and knees.  T721.  Examination of her back revealed paraspinal muscles tense to palpation, bilateral hip pain to joint "spay" palpation, inability  to do straight leg test secondary to pain, ability to flex forward but not side to side or back, inability to sit for over five minutes, and a need to change position.  T723.  Neurological exam revealed an antalgic and guarded slow gait, and her knee exam revealed pain to flexion and

9

extension.  T723.  Ms. G.S.'s diagnoses included degenerative joint disease involving multiple joints, severe degenerative disc disorder lumbo-sacral spine, diabetes, and knee pain bilateral.  T723.  Ms. G.S. lived outside the "chisda" so could not be referred to Orthopedic Institute for her chronic back and knee pain, and she hoped to get housing there so she could get more health care. T724.

### 2.     Evidence Dated After the December 28, 2016, Filing Date

Ms. G.S. was seen by Grisel Rodriguez-Diaz, M.D., at Wagner Indian Health on April 13, 2017, for diabetes follow-up and low back pain.  T865.  Her BMI was 35.12, and she reported bilateral knee pain, left worse than right, and not eating healthy due to finances.  T865.  Ms. G.S. said her physical activity was minimal due to pain, and her psychiatric medications were helping. However, she said she was still depressed.  T866.  Dr. Rodriguez-Diaz described Ms. G.S. has having a normal mood and affect.  T866.

Ms. G.S. had normal sensation, full muscle strength, and a slow and antalgic, but unassisted gait.  T866.  Examination of her back revealed she was unable sit for over five minutes, unable to flex back or side to side, was constantly rubbing [her] back side, and was very tender to palpation to the L5 and S1 dermatomes.  T866.  Ms. G.S.'s gait was slow and antalgic, and she wore a knee brace on her left knee.  Ms. G.S. could extend and flex her right knee, but with pain.  T866.  Her diagnoses included diabetes uncontrolled, and bilateral knee pain.  T866.  Dr. Rodriguez-Diaz stated that Ms. G.S. reported trying smaller portions and healthy choices, "but the reality is that her diabetes

is totally out of control." T868.  Dr. Rodriguez-Diaz stated that Ms. G.S. must start monitoring and knowing her numbers.  T868.

Ms. G.S. was seen at the Rosebud Clinic on May 20, 2017 for cellulitis on her back.  T981.  Inam Ur Rahman, M.D., assessed her with cellulitis, low back pain, numbness, and low-grade fever.  T983.  A May 20, 2017, CT of Ms. G.S.'s thoracic spine obtained due to cellulitis, low back pain, and leg numbness, revealed findings consistent with cellulitis involving the subcutaneous tissues across her back.  T595.

On May 23, 2017, Ms. G.S.'s prompt for contact was a need to recheck her cellulitis, which hurt and sometimes itched.  T908.  George Drago, P.A., stated that all of Ms. G.S.'s other symptoms were negative.  T909.  P.A. Drago administered IV antibiotic treatment for Ms. G.S.'s cellulitis.  T904.

On May 24, 2017, Ms. G.S. reported to P.A. Drago that her cellulitis pain was much better.  T912.  He described Ms. G.S. as oriented, with a normal mood, affect, and memory.  T913.  Ms. G.S. had appropriate behavior and no memory loss.  T913.  Ms. G.S. received another IV antibiotic treatment for her cellulitis and was told to return in a week.  T912, 914.

Amanda McMillan, N.P., saw Ms. G.S. at Flandreau Sioux Clinic on July 12, 2017, for follow-up on arthritis pain, diabetes, depression, and PTSD. T915.  Ms. G.S. was taking tramadol for pain, her last A1C was 11.0, and she was feeling quite emotional and wanted to restart citalopram for her depression and PTSD and see a counselor if possible.  T915.  Ms. G.S. complained of generalized arthritis pain, numbness and tingling to the hands and feet, and

11

elevated blood sugars.  T916.  N.P. McMillan restarted the citalopram and gave Ms. G.S. a referral for behavioral health.  T917.  N.P. McMillan stated that Ms. G.S. was in no acute distress.  T917.  Ms. G.S. could walk independently. T917.  N.P. McMillan told Ms. G.S. to take detemir as prescribed at 38 units instead of 25 units as Ms. G.S. had been doing, and also prescribed sitagliptin. T917.  N.P. McMillan referred Ms. G.S. for a counselor, but because she was not in crisis, Ms. G.S. could follow up in 4-6 weeks.  T917.

Ms. G.S. was seen at Flandreau Sioux Clinic Behavioral Health by Ms. Williams on July 17, 2017, for complaints about her anger, self-worth and self-esteem.  T919.  Her stressors included emotional pain from loss of her brother and struggling with the loss of her physical abilities.  T919. Examination revealed Ms. G.S. was "noticeably in pain," and she has a sad mood, self-reported increased irritability, and sleep struggles due to pain. T920.  Ms. Williams also noted that Ms. G.S. was attentive, focused, and organized, and had coherent, logical, and alert thought patterns.  T920.

Ms. G.S. was seen at Flandreau Sioux Clinic on September 12, 2017, by Amanda McMillan, N.P., for follow-up for her diabetes and increasing back pain.  T922.  Her diabetes was historically poorly controlled and her recent blood sugars ranged from 279 to 436 the prior two weeks with an A1C of 11.0. T922, 929.  Ms. G.S. stated she was planning on traveling back to Rosebud so she could request an orthopedic referral for her back pain.  T922.  N.P. McMillan added Novolog, discontinued Glyburide due to hypoglycemic risk, and encouraged Ms. G.S. to use tramadol for her pain and to follow up with

orthopedics.  T924.  N.P. McMillan stated that she had an intact range of motion, the ability to walk independently, and the ability to change positions from chair to standing on her own.  T924.  N.P. McMillan told Ms. G.S. that she was not taking her Levemir correctly and added Novolog with meals.  T924.

Daniel Heyduk, P.A., saw Ms. G.S. at the Rosebud Clinic on October 5, 2017, for her back pain, which she said was 10/10, and depression.  T937.  Ms. G.S. said that she was told she had MS, but she had not had a confirmatory MRI.  T937.  Examination showed full muscle strength and a regular and even gait with no abnormalities.  T939.  Ms. G.S.'s arms and legs were normal.  T939.  Her thought process was coherent, and she had no deficits in insight or judgment.  T939.  Examination revealed pain to touch at spinous processes of the lumbar spine, limited range of motion of the thoracic and lumbar spine due to pain, and limited flexion and extension of the thoracic and lumbar spine due to pain.  T939.  Ms. G.S. was referred for a brain MRI to rule out MS.  T940.  P.A. Heyduk, described Ms. G.S. as oriented and in no acute distress.  T939.  P.A. Heyduk stated that Ms. G.S. was neurologically normal, with intact sensation and full strength.  T939.  P.A. Heyduk stated that Ms. G.S.'s gait was even and regular with no limp or shuffle.  T939.  Ms. G.S. had no judgment deficits and her thought processes were coherent and congruent.  T939.  P.A. Heyduk stated that she had no deficits in recent or remote memory.  T939.

Ms. G.S. was taken by ambulance to the Rosebud Emergency Room on October 16, 2017, with complaints of severe back pain that radiated to her

13

legs.  T1022, 1031.  In the review of systems section of the medical note, it stated that Ms. G.S. had MS with a history of numb areas in both legs.  T1023. Examination revealed she was obese, deconditioned, generally weak legs due to pain in her low back when the motor exam was performed, altered sensation in her lateral lower legs and upper inner thighs, and abnormal left ankle dorsiflexion, great toe dorsiflexion, and heel walk.  T1024.  Lumbosacral x-rays revealed grade 1 spondylolisthesis of L5 on S1 with moderately severe disc height loss with some minor reactive changes, moderate disc height loss at L4-L5 but otherwise maintained.  T1100.  Carey Buhler, Radiologist, listed the impression as including probable bilateral spondylolysis at L5, otherwise normal curvature, and otherwise normally maintained discs.  T1100.  The diagnosis by Edward Riley, D.O., was sudden exacerbation of chronic low back pain in an MS patient and no signs of disc herniation, radiculopathy, or cauda equine syndrome.  T1026.  Dr. Riley stated that Ms. G.S.'s scheduled MRI "will show the status of her MS" and her L5/S1 nerve roots.  T1026.

Ms. G.S. had lumbar, thoracic, and cervical spine MRIs and a brain MRI on October 18, 2017.  T1111-16.  A lumbar spine MRI revealed chronic bilateral L5 spondylolysis with severe lateral recess and neural foraminal stenosis at L5-S1, and moderate lumbar spine degeneration with stenosis. T1112.  The MRI showed effacement of the passing L4 nerve root bilaterally at L3-L4, impingement upon the passing L5 nerve root on the left at L4-L5, and posterior impingement upon the passing S1 nerve roots at L5-S1.  T1111.  A thoracic spine MRI revealed moderate thoracic spine degeneration with mild

14

stenosis.  T1113.  A cervical spine MRI revealed multilevel shallow disc protrusions and no evidence of cord edema or demyelination.  T1115.  A brain MRI revealed small scattered white matter T2 hyperintense foci that Rick Kukulka, M.D., thought was consistent with MS considering Ms. G.S.'s provided history.  T1116.

Ms. G.S. was transferred from Rosebud ER to the Rapid City Hospital on November 29, 2017, for a psychiatric evaluation after reporting suicidal tendencies to her counselor who sent her to the ER.  T73.  Ms. G.S. reported feeling suicidal thoughts for approximately one year and noted her medical conditions, a death in the family, and a stressful living situation.  T73. Examination by Lyndsy Kinghorn, N.P., a mental health specialist, revealed suicidal ideas, depressed mood (tearful), but no hallucinations or self-injury. T74.  She had decreased range of motion in her lumbar back with tenderness, bony tenderness, and pain.  T74.  Ms. G.S.'s speech, behavior, judgment, thought content, cognition, and memory were normal.  T74.  Heidi Edison, M.S.W., stated that Ms. G.S. was tearful, tired, and appeared overwhelmed physically and emotionally.  T76.  Ms. G.S. was admitted to the hospital and discharged on December 2, 2017.  T79, 92.  Examination on November 30, 2017, revealed Ms. G.S. was ambulating with a walker; behavior was retarded and she was crying; psychomotor retardation; a dysphoric and depressed mood; constricted affect; passive suicidal ideation; vegetative symptoms of hopelessness, decreased interest and concentration, and fair insight, judgment, and intelligence.  T86.  Ms. G.S.'s thought process was goal directed and she

had intact memory.  T86.  Ms. G.S.'s diagnoses included major depression recurrent moderate and pain disorder with physical and psychological characteristics.  T87.

Ms. G.S. was seen at Flandreau Sioux Clinic on February 13, 2018, by Amanda McMillan, D.N.P., to resume care after returning from Rosebud for diagnostic testing.  T1316.  N.P. McMillan stated that Ms. G.S. was neurologically normal, with normal mood, memory, and judgment.  T1319.  Ms. G.S.'s feet had normal sensation.  T1319.  Ms. G.S. had fair insight and judgment and good impulse control.  T87.[5]  Ms. G.S. complained of back/hip pain, leg weakness and numbness, hand numbness, depression, and anxiety due to pain, and overall fatigue.  T1316, 1318.  The assessment included degeneration of the intervertebral disc, cervical, thoracic, and lumbar per MRI, depressive disorder, lumbar spondylosis per MRI, spinal stenosis, lumbar and thoracic per MRI, and diabetes.  T1320.  Meloxicam and tramadol were continued for pain, Cymbalta and Vistaril were continued for Ms. G.S.'s depression and anxiety with a plan to restart counseling, and her Levemir dosage was increased for her uncontrolled diabetes.  T1320.

Ms. G.S. was seen by Todd Zimprich, M.D., at Avera Neurology on March 22, 2018, for evaluation of an abnormal MRI, questionable multiple sclerosis, parathesis in the shins, low back pain, leg pain, tingling and numbness in the

---

[5] Here, the parties cite an unrelated November 30, 2017, report from Rapid City Regional Hospital authored by Adam Pruett, M.D.  As for Ms. G.S.'s February 13, 2018, visit to the Flandreau clinic, N.P. McMillan reported her judgment was normal but did not comment on her insight or impulse control.  T1319.

wrists and hands, headaches, and weak and wobbly legs.  T1285-86.
Dr. Zimprich observed that Ms. G.S.'s lower extremity sensory responses were
relatively well preserved.  T1285.  Ms. G.S. reported exacerbated numbness in
her hands with activity and improvement with rest, worsening with driving,
and complaints of dropping things.  T1286.  Ms. G.S. reported no clear upper
extremity weakness and she could not invoke the hand paresthesia of the head
or neck with position change.  T1286.  Dr. Zimprich wrote that Ms. G.S.'s
muscle bulk, tone and strength were normal.  T1286.  Dr. Zimprich observed
that Ms. G.S.'s casual gait was slightly wide-based but otherwise steady, and
her tandem gait was mildly impaired.  T1287.  Ms. G.S. had no tremor in the
arms and fingers.  T1287.  Testing for balance (Romberg's) was negative.
T1287.  She reported headaches 3-4 times per week in the left occiput with
radiation to the right frontal region, associated nausea, photo/photophobia,
but no visual component.  T1286.  She said her legs felt weak and wobbly and
she had been using crutches to take the weight off of them.  T1286.  Ms. G.S.
also reported difficulty sleeping, fatigue, night sweats, arthritis, low back pain,
memory loss, impaired concentration, depression/anxiety, and mood swings.
T1286.  Examination by Dr. Zimprich revealed Ms. G.S. needed frequent
redirection and prompting when relating her history, trace lower extremity
edema, deep tendon reflexes suppressed diffusely, reduced pinprick at the tip
of each pointer finger, reduced pinprick with suggestion of a distal proximal
gradient in the lower extremities to just above the ankles, reduced vibration
sense at great toes relative to knees, casual gait slightly wide-based, tandem

gait mildly impaired, and otherwise normal.  T1286-87.  Ms. G.S.'s depression screening was positive with a PHQ-9 score of 25.  T1287.  Ms. G.S. was taking Duloxetine and trying to see a psychiatrist due to thoughts of self-harm. T1288.  Dr. Zimprich also reviewed Ms. G.S.'s thoracic, lumbar and cervical spine and brain MRIs.  T1286.  Dr. Zimprich suspected her upper extremity symptoms were due to carpal tunnel syndrome, and EMG tests were ordered that revealed median neuropathy at each wrist consistent with carpal tunnel, mild on left and moderately severe on the right, mild right ulnar neuropathy at or near the elbow, and chronic, active left L5 radiculopathy.  T1282, 1284. Dr. Zimprich suspected her lower extremity symptoms were multifactorial, with a significant element of associated lumbosacral spinal stenosis.  T1284. Dr. Zimprich found Ms. G.S.'s severe headaches consistent with migraines syndrome, that she may be developing a rebound due to the frequent use of Tramadol, and that she is likely depressed which may be magnifying her headache and pain symptoms.  T1284.

Ms. G.S. was seen at Flandreau Sioux Clinic on May 29, 2018, by Amanda McMillan, D.N.P., for follow up with her diabetes and chronic pain. T1324.  N.P. McMillan described Ms. G.S. as having no edema and atrophy in her extremities.  T1326.  Ms. G.S. had normal strength, tone, and range of motion.  T1326.  Ms. G.S. walked independently with a stiff, guarded gait. T1326.  N.P. McMillan stated Ms. G.S. had a depressed mood and flat affect but normal memory and intact judgment.  T1326.  N.P. McMillan told Ms. G.S. that marijuana is a natural depressant and likely made her symptoms worse.

18

N.P. McMillan encouraged Ms. G.S. to stop.  T1327.  She reported good

medication compliance, but her blood sugars were in the 200s and 300s

recently.  T1324.  She had seen a neurologist who performed nerve conduction

tests that showed bilateral carpal tunnel, mild right ulnar neuropathy, and

chronic, active left L5 radiculopathy.  T1324.  N.P. McMillan did not think

Ms. G.S. had MS, rather he had a working diagnosis of diabetic peripheral

neuropathy and recommended a follow up MRI in October.  T1324.  N.P.

McMillan noted that the neurologist addressed Ms. G.S.'s migraines and had

suggested a trial of topiramate and reduced Tramadol.  T1324.  Ms. G.S. had

done better with the reduced Tramadol but struggled with more back pain.

T1324.  Ms. G.S.'s Novolog dosage was increased for her uncontrolled diabetes,

she was given wrist braces for night and daytime use for her carpal tunnel, her

pain medications were continued with a recommendation for a physical therapy

evaluation, and she was seeing a counselor for her depression that day.

T1327.

Ms. Williams saw Ms. G.S. at Flandreau Sioux Clinic on May 29, 2018,

for counseling.  T1329.  Ms. Williams noted that the neurology results

mentioned that Ms. G.S. may be struggling more due to high anxiety and

depression.  T1329.  Ms. Williams stated pain can cause depressive episodes

and chronic pain tends to cause low energy and problems with focus.  T1329.

The counselor noted that Ms. G.S. was applying for disability and stated, "it

seems her functioning is affected in such a way that she should qualify."

T1329.  Ms. G.S.'s affect was mood congruent, and flat, and her mood was

19

depressed, frustrated, and anxious.  T1329.  Ms. G.S. reported to Ms. Williams that she had money conflicts with her daughter because even though she had been the nanny for several years, she did not get paid beyond room and board.  T1329.  Ms. G.S. said her daughter felt she was costing them money because she had to use their car and get gas money from them to get to her appointments.  T1329.  Ms. G.S. said she was desperate to get her own place but did not have money or income for a deposit.  T1329.  Ms. Williams described Ms. G.S. as appearing flat and depressed.  T1329.  Ms. Williams stated that Ms. G.S. had organized thoughts and good judgment.  T1329.

Ms. Williams saw Ms. G.S. at Flandreau Sioux Clinic on June 5, 2018, for counseling.  T1331.  Ms. G.S. told Ms. Williams that her daughter showed no appreciation for her living with the daughter's family and fulfilling a promise to stay with the children until they are school-aged.  T1331.  Ms. G.S. felt a sense of urgency moving out.  T1333.  The counselor noted Ms. G.S. had been to her physical therapy evaluation and PT had recommended twice weekly therapy.  T1331.  Ms. G.S. could not do that frequency of therapy because she relied on gas money from her daughter, but her daughter believed the appointments were unnecessary and Ms. G.S. could heal herself if she prayed more.  T1331.  Her mood was low, frustrated, and anxious and her sleep was poor due to pain.  T1331.  Ms. G.S. said she would be unable to have another session for seven weeks, but if she were able to get housing in Flandreau, she could follow up more regularly.  T1332.  Ms. Williams observed that Ms. G.S. had coherent and organized thought process and good judgment.  T1331.

Ms. Williams stated Ms. G.S. met the criteria for major depressive disorder, recurrent, moderate to severe.

Ms. G.S. was seen at Flandreau Sioux Clinic on July 24, 2018, for follow up with her pain medications and requested a refill of her Tramadol, which she used for chronic back and knee pain as well as her migraines.  T1333.  She complained of low back pain, left knee pain, muscle spasms in her legs and back, migraines, numbness in her feet, depression, and high blood sugars.  T1334.  N.P. McMillan observed that Ms. G.S. was not in acute distress.  T1335.  Ms. G.S.'s muscle strength, tone and range of motion were "without appreciable deficit," and Ms. G.S. walked independently, with a smooth and even gait.  T1335.  Ms. G.S.'s neurological signs were intact.  T1335.  Examination revealed her mood was depressed and affect congruent.  T1335.  Topamax was started for her migraines, Tramadol continued for pain, and Cyclobenzaprine was prescribed for muscle spasms.  T1335.  An x-ray of her left knee was obtained and revealed mild to moderate tricompartmental degenerative changes.  T1336.  A steroid injection of her knee was given at her next appointment on August 21, 2018.  T1341.

N.P. McMillan saw Ms. G.S. at Flandreau Sioux Clinic on August 21, 2018 for a diabetes follow up.  T1338.  She reported back pain between her shoulder blades and shortness of breath with walking or steps and chest heaviness with activity.  T1338.  N.P. McMillan observed that Ms. G.S. had no deficits in her musculoskeletal strength, tone, and range of motion.  Ms. G.S. walked independently with a smooth and even gait.  T1341.  Ms. G.S. was

oriented with a euthymic mood and affect.  T1341.  N.P. McMillan described Ms. G.S. as "open and talkative with good eye contact."  T1341.  A cardio referral was recommended, but Ms. G.S. declined because she had no way to pay for the cardio evaluation.  T1342.  She was trying to move to Flandreau so she could obtain more than direct services.  T1342.

Ms. G.S.'s counselor, Ms. Williams completed a medical source statement on October 30, 2018, regarding Ms. G.S.'s ability to perform work-related mental activities on a "sustained basis," meaning performing the activities eight hours per day, five days per week.  T1351.  Ms. Williams stated Ms. G.S. would have marked limitations if she attempted "sustained" work in her ability to understand and remember complex instructions; carry out complex instructions; and make judgments on complex work-related decisions.  T1351. Ms. Williams stated Ms. G.S. would have moderate limitations if she attempted "sustained" work in her ability to make judgments on simple work-related decisions; and in her ability to respond appropriately to usual work situations and changes, and Ms. G.S. had other mild work limitations.  T1351-52. Ms. Williams explained that Ms. G.S. had major depression prior to her chronic pain and now the depression has increased, specifically noting problems with problem solving, rigid behaviors, blunted affect, feelings of worthlessness, slowed thought, distortions of failure and undue fear/preoccupation with having MS.  T1352.  Ms. Williams stated her opinions were supported by clinical interviews in conjunction with medical reports, Ms. G.S.'s grief/loss of physical and mental abilities, and chronic fatigue due to poor sleep.  T1352.

N.P. McMillan saw Ms. G.S. at Flandreau Sioux Clinic on November 13, 2018 for a diabetes follow-up. T1344. N.P. McMillan wrote that Ms. G.S. was "in no acute distress." T1346. N.P. McMillan observed that Ms. G.S.'s gait was stiff, but her range of motion was without deficit. T1346. Ms. G.S. reported that she was still living with her daughter in Brookings and felt she was unable to work due to her physical restrictions with her back pain and right-hand pain/cramping, and she had difficulty with steps due to pain. T1344. She was doing exercises and stretches she learned in physical therapy. T1344. Ms. G.S. reported back stiffness and pain, leg/knee stiffness and pain, bilateral wrist pain, right hand cramping, bilateral hand numbness, depression and anxiety, and elevated blood sugars. T1346. Examination showed a stiff gait but range of motion was without gross deficit. T1346. Ms. G.S.'s diabetes remained uncontrolled, and her Levemir dosage was increased. T1348. N.P. McMillan noted Ms. G.S. had exercise limitations due to pain and nutrition limitations due to low income. T1348. Ms. G.S. was encouraged to return to counseling due to her anxiety and depression, and her pain medications were continued for her "image-proven" spinal stenosis. T1348.

Ms. G.S. was seen at Flandreau Sioux Clinic on February 19, 2019, for follow-up of her chronic diabetes, back pain, and depression. T40. Ms. G.S. reported that she wears her wrist braces for her carpal tunnel regularly, but her hands have been achy and stiff, like there are knots near the base of her thumbs. T40-41.

Ms. G.S. was seen at Flandreau Sioux Clinic on April 16, 2019, for follow-up of her chronic conditions, including her back pain. T50. The record noted that physical therapy for her back was not possible due to inability to travel between Brookings and Flandreau that frequently, and options such as epidurals for pain management were not available to Ms. G.S. because she lived outside of Moody County and could not afford self-payment. T50.

### 3. State Agency Assessments

The State agency medical consultant reviewed the file on May 12, 2017, and concluded Ms. G.S. had severe impairments of Dysfunction – Major Joints, Obesity, Disorders of Back-Discogenic and Degenerative, and non-severe impairments of hypertension and diabetes. T177, 181. The consultant concluded Ms. G.S. was limited to lifting 20 pounds occasionally, 10 pounds frequently, standing or walking four hours per workday, sitting more than six hours per workday, occasionally climbing ramps/stairs, ladders/ropes/scaffolds, stooping, crouching, kneeling, and crawling. T180. The consultant noted that Ms. G.S. had not proceeded with a knee replacement due to lack of insurance. T181. The State agency medical consultant at the reconsideration level made essentially identical findings on December 5, 2017. T192, 195-97.

The State agency psychological consultant at the initial level reviewed the file on May 12, 2017, and concluded Ms. G.S. had no severe mental impairments, but had non-severe trauma and stressor-related disorders, and depressive, bipolar and related disorders that caused mild limitations in her

24

ability to understand, remember or apply information; interact with others; concentrate, persist, or maintain pace, and adapt or manage oneself.  T177-78. The State agency psychological consultant at the reconsideration level made essentially identical findings on November 14, 2017.  T192-94.

**C.      Other Evidence**

In a Function Report completed with her application process, Ms. G.S. stated that, in addition to other problems, she had problems reaching, using her hands and stated her hands get cramped.  T328.  Ms. G.S. also stated in the Function Report that she helped with the grandchildren when she could. T324.  She could change her one-year-old grandson's diapers.  T324.  She could prepare diabetic foods (T325), grocery shop (T326), and socialize on the computer.  T327.  In a Disability Report completed with her application, Ms. G.S. stated the arthritis in her hands, shoulders, knees, and back was worse.  T332.  In a Medication Report completed by Ms. G.S., she stated one of her medications was Meloxicam, which she took as an anti-inflammatory for arthritis swelling and stiffness.  T379, 387.  In a Recent Medical Treatment report completed by Ms. G.S., she stated she had seen a neurologist who had diagnosed her with carpal tunnel, pinching of the nerve in the right elbow, parathesis of the lower extremity, migraines, abnormal brain MRI, and depression, and she was to have a repeat MRI in October.  T380, 383.

Ms. G.S.'s earning records showed no earnings in 1985, 1988, 1989, 1992, 1993, 1994, 1997, 1999, 2002, 2003, 2006 through 2011.  T287.

Ms. G.S. earned less than $1,000.00 in 1984, 1986, 1990, 1996, 1998, and 2004.  T287.

**D.    Testimony at ALJ Hearing:**

**1.    Ms. G.S.'s Testimony**

Ms. G.S.'s representative stated that he did not have any preliminary matters to discuss and he did not make an opening statement.  T128.  During the hearing, the ALJ directed Ms. G.S.'s representative to provide updated records and Ms. G.S.'s representative agreed to do so.  T153-54.  After the ALJ questioned Ms. G.S., the ALJ asked Ms. G.S.'s representative if he had any additional questions.  T154.  Ms. G.S.'s representative stated that he had a few follow up questions but remarked, "Judge, you've been very thorough."  T155. At the conclusion of the hearing, the ALJ asked Ms. G.S.'s representative, "Can you think of anything else before we do go off the record in this case?"  T169. Ms. G.S.'s representative replied, "No, Judge, thank you very much."  T169.

Ms. G.S. testified that she lived with her daughter, son-in-law, and her grandchildren, ages 13, 11, 9, and 3.  T129.

Ms. G.S. testified that she could drive in the local area.  T129.  She thought she could drive three or four hours back to her hometown, but when doing that she would have additional pain in her back and legs.  T130.

Ms. G.S. testified she was right-handed.  T129.

Ms. G.S. testified that her last job was as a bus monitor for the Head Start program where she helped the children buckle into booster seats and

26

helped them up.  T131-32.  She helped the children get off the bus and into the classroom.  T133.

Ms. G.S. stated that her doctor recommended that she do the exercises provided by her therapist to keep her blood sugar under control, and she did do that, but she felt so stressed out over her body being so tired and sore. T135-36.  She said her stress was overwhelming. T136.

Ms. G.S. testified that she did not have health insurance.  T130.  She stated she goes to the Flandreau Tribe for help with her diabetes clinicals. T130.  When asked about community clinics or free clinics, Ms. G.S. testified that she had to be living on the reservation in order to get referrals out for care and she didn't have insurance where she was living in Brookings.  T141-42. She said she tried, and they told her she would have to go back to Rosebud to get care or referrals, and she was not aware of any free clinic in Brookings like the ALJ said they have in Sioux Falls.  T142.

Ms. G.S. testified that she had diabetes and her blood sugars are typically in the upper 200s, but when she is stressed, they stay in the 300s and she feels kind of shaky, gets slight headaches, and sweats.  T134-35, 137.

Ms. G.S. testified that she used wraps and knee braces for bone spurs and had very little cartilage in her left knee, and initially she was able to obtain steroid injections, which helped, but she couldn't get any more after she moved.  T138-39.  She said her right knee had similar pain as the left, and she has to put her weight from her left leg on to her right.  T139.  She rated her left knee pain as 8-9 out of 10, and right as 5.  T139.  Ms. G.S. confirmed that a

knee replacement had been recommended when she was in Wagner, but since she was not living there, she could not get it.  T140.

Ms. G.S. testified she had back pain, which 2017 MRIs showed was spinal stenosis, bone spurs and bulging discs, but since she was not living on the reservation, she could not get any more treatment.  T141.  She said when she tried to get treatment, she was told she would have to go back to Rosebud, the reservation.  T142.

Ms. G.S. testified that if she walks more than a block or two, she gets pain in her knees, low back and hips, and barely makes it back home.  T144.  On good days when she cooks a little bit, she still needs to sit and take rests, and only stands maybe 15-20 minutes.  T145.  She said in a big fluffy recliner she can sit about 40-45 minutes, but only about 20 minutes in an office-type chair.  T145.

Ms. G.S. said she could lift a 20-pound bag of potatoes, but it would scare her because she is shaky and it hurts her wrists.  T146.  Ms. G.S. said sometimes when she picks things up, she drops them because she cannot  get a good grip.  T146.  She said she would use two hands to lift a gallon jug, and she cannot do it with one hand anymore.  T147.  Ms. G.S. stated that she did her own laundry.  T147-48.  Ms. G.S. testified that she was able to babysit or supervise her four grandchildren.  T148.  She could give her three-year-old grandson a bath.  T148.  She stated that she was able to remember to take her medications and check her blood sugars.  T149.  She testified that she did not have any trouble getting along with others.  T150.  Ms. G.S. testified she wore

wrist braces at night and sometimes during the day also.  T147.  She said the tips of her fingers feel numb, so she has difficulty with buttons, zippers, or things like that.  T155.  Ms. G.S. testified that her right hand was worse than her left and she had started using her left arm most of the time because the right gets cramped if she uses it.  T155.  She said she had arthritis in her shoulders that impacts reaching for things.  T156.

Ms. G.S. testified that she had been getting migraines for about three years, that she had them about twice per week, and that she takes medication for them during the evening.  T149.

Ms. G.S. testified that her neurologist had stated that she did not have MS, but there were white spots on her brain that the neurologist called abnormal.  T151.  Ms. G.S. said she felt that was why she  probably could not focus anymore.  T151.

### 2.    Vocational Expert Testimony

Ms. G.S.'s attorney accepted the VE's qualifications.  T160.

The ALJ asked the VE a hypothetical question that mirrored the limitations included in the RFC determined by the ALJ, and the VE testified that the individual would be unable able to perform past work as identified by the ALJ and would have no transferrable skills.  T162-63.  The VE testified there would be other jobs the individual could perform and identified the occupations of bench assembler, DOT# 706.687-010; electronics worker, DOT# 726.687-010; and molding machine tender, DOT# 556.685-022, and provided

the number of jobs available "in the national economy"[6] for each occupation. T164.  The VE testified that these jobs would all require up to frequent reaching, handling, and fingering.  T164.

The VE testified that if the claimant was off task in excess of 10 percent of the workday, it would preclude all of the jobs he had identified and if the claimant was absent from work more than two days per month that would also preclude competitive employment.  T166.

The VE testified that none of his testimony was inconsistent with the Dictionary of Occupational Titles.  T167.

## DISCUSSION

### A.   Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Minor v. Astrue, 574 F.3d 625, 627 (8th Cir. 2009).  Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975).  "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, . . ., and requires a scrutinizing analysis, not

---

[6] The parties' joint statement of material facts reads "nationally" here.  See Docket No. 16 at p. 25, ¶ 68.  However, the VE testified about the number of these jobs "in the national economy."  T164.  As noted in footnote 3, above, the difference between these terms is at issue in this case.

merely a rubber stamp of the [Commissioner's] action." Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (quotations and citations omitted). Yet, "[i]n conducting [its] limited and deferential review of the final agency determination under the substantial-evidence standard, [the court] must view the record in the light most favorable to that determination. Chismarich v. Berryhill, 888 F.3d 978, 980 (8th Cir. 2018).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. Minor, 574 F.3d at 627. The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005). If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed. Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000) (citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. Walker ex rel. Walker v. Apfel, 141 F.3d

852, 853 (8th Cir. 1998) (citation omitted).  The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court.  <u>Smith</u>, 982 F.2d at 311 (finding "appropriate deference" should be given to the SSA's interpretation of the Social Security Act).

**B.      The Disability Determination and the Five-Step Procedure**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 1382c(a)(3)(A), 1382c(a)(3)(C); 20 C.F.R. § 416.905.  The impairment must be severe, making the claimant unable to do her previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. §§ 416.909-.911.

The ALJ applies a five-step procedure to decide whether an applicant is disabled.  This sequential  analysis is mandatory for all SSI applications.  <u>Smith v. Shalala</u>, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 416.920.  The five steps are as follows:

> **Step One:** Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(i).  If the applicant is engaged in substantial gainful activity, she is not disabled, and the inquiry ends at this step.

> **Step Two:** Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e., whether any of the applicant's impairments or combination of impairments significantly limit her physical or mental ability to do basic work activities.  20 C.F.R. §416.920(a)(4)(ii).  If there is no such impairment or combination of impairments, the applicant is not disabled, and the inquiry ends at this step.  NOTE: the regulations

prescribe a special procedure for analyzing mental impairments to determine whether they are severe.  Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 416.920a.  This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three:** Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in appendix 1, subpart P of part 404.  20 C.F.R. § 416.920(a)(4)(iii).  If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry.  Bartlett v. Heckler, 777 F.2d 1318, 1320 n.2 (8th Cir. 1985).  This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work.  Heckler v. Campbell, 461 U.S. 458, 460, (1983).  If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment*, the ALJ must proceed to step four.  NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing.  20 C.F.R. § 416.920a.

**Step Four:** Determine whether the applicant is capable of performing past relevant work.  To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe*) to determine the applicant's RFC.  If the applicant's RFC allows her to meet the physical and mental demands of her past work, she is not disabled.  20 C.F.R. §§ 416.920(a)(4)(iv); 416.945.  If the applicant's RFC does not allow her to meet the physical and mental demands of her past work, the ALJ must proceed to step five.

**Step Five:** Determine whether any substantial gainful activity exists in the national economy which the applicant can perform.  To make this determination, the ALJ considers the applicant's RFC, along with her age, education, and past work experience. 20 C.F.R. § 416.920(a)(4)(v).

## C.   Burden of Proof

The plaintiff bears the burden of proof at steps one through four of the

five-step inquiry.  Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994);

Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 416.912.  The burden of proof shifts

to the Commissioner at step five.  "This shifting of the burden of proof to the

Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting is "a long-standing judicial gloss on the Social Security Act." Walker v. Bowen, 834 F.2d 635, 640 n.3 (7th Cir. 1987), superseded by statute as stated in Mandella v. Astrue, 820 F. Supp. 2d 911 (E.D. Wis. 2011). Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." Stormo v. Barnhart 377 F.3d 801, 806 (8th Cir. 2004).

**D.    Ms. G.S.'s Assignments of Error**

Ms. G.S. asserts the Commissioner erred by: (1) failing to identify all Ms. G.S.'s severe impairments; (2) determining an RFC that is not supported by substantial evidence; and (3) failing to carry its burden at step five to identify jobs Ms. G.S. could perform based on substantial evidence. See Docket No. 18 at p. 1. The Commissioner asserts the ALJ's decision is supported by substantial evidence in the record and the decision should be affirmed. See Docket Nos. 21 & 22. Ms. G.S.'s assignments of error are discussed in turn below.

**1.    Whether the Commissioner Failed To Identify All of Ms. G.S.'s Severe Impairments**

The ALJ's written decision is contained in the administrative record at T104-16. That portion of the ALJ's analysis wherein the ALJ identifies Ms. G.S.'s impairments at step two is found on pages 3-4 (T106-07) of the written decision. Ms. G.S. asserts the ALJ failed to properly identify her carpal

tunnel syndrome (CTS) and right ulnar neuropathy at or near the elbow as severe impairments.  The ALJ identified the following medically determinable severe impairments: (1) diabetes; (2) obesity; (3) chronic bilateral L5 spondylosis with severe lateral recess and neural foraminal stenosis at L5-S1; (4) osteoarthritis bilateral knees; (5) mild thoracic degenerative disc disease; (6) major depressive disorder; and (7) post-traumatic stress disorder.  T106.  The ALJ identified medically determinable impairments of CTS, moderately severe in the right and mild in the left, right ulnar neuropathy at the elbow, and hypertension, but concluded they were non-severe.  T107.  Ms. G.S. asserts the ALJ erred by determining the CTS and right ulnar neuropathy were not severe.

At step two, it is the claimant's burden to demonstrate a (1) severe and (2) medically determinable impairment, but the burden is not difficult to meet.  Kirby v. Astrue, 500 F.3d 705, 707-08 (8th Cir. 2007); Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001).  An impairment is "medically determinable" if it results from "anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques."  See 20 C.F.R. § 416.921.  "Therefore, a physical or mental impairment must be established by objective medical evidence from an acceptable medical source."  Id.  If an impairment is medically determinable, then the Commissioner next considers whether it is severe.  Id.

An impairment or combination of impairments is not severe if it does not significantly limit the claimant's physical or mental ability to do basic work

activities.[7]  See 20 C.F.R. § 416.922(a).  Basic work activities include, but are not limited to: walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, use of judgment; responding appropriately to supervisors and co-workers and usual work situations, dealing with changes in a routine work setting, and understanding, carrying out, and remembering simple instructions.  Id. at (b).  At step two, only medical evidence is evaluated to assess the effects of an impairment on the ability to perform basic work activities.  See Social Security Ruling ("SSR") 85-28, 1985 WL 56856, at *2 (Jan. 1, 1985).  Therefore, subjective complaints by the claimant are normally not part of the step two analysis.  Id.

An ALJ must explain the basis for their decision and not leave the reviewing court to "speculate on what basis the Commissioner denied a . . . claim."  Collins v. Astrue, 648 F.3d 869, 872 (8th Cir. 2011).  If there is any doubt as to whether a claimant has met their burden to show a severe impairment, it is to be resolved in favor of the claimant.  Dewald v. Astrue, 590 F. Supp. 2d 1184, 1199 (D.S.D. 2008); Quinn v. Berryhill, No. 4:17-CV-04013-KES, 2018 WL 1401807, at *5 (D.S.D. Mar. 20, 2018).

Ms. G.S. asserts the ALJ should have found her CTS and neuropathy impairments to be severe at step two.  She also argues that she met her burden to show these impairments are severe, citing medical records showing

---

[7] Paradoxically, the Commissioner's regulations do not define "severe," but rather define what is "not severe."  The inference from the regulation is that a severe impairment *does* significantly limit a claimant's physical or mental ability to do basic work activities.

36

diagnoses by a neurologist of bilateral CTS and right ulnar neuropathy at or near the elbow.  See Docket No. 18 at p. 3.  Ms. G.S. asserts the ALJ improperly assumed the role of medical expert by interpreting the results of her neurology exam and conduction tests.  In so doing, Ms. G.S. argues, the ALJ fell short of its duty to fairly and fully develop the record.  Ms. G.S. also argues the ALJ's error was not harmless because the ALJ did not consider her CTS or right ulnar neuropathy when determining her RFC, and each of the jobs found by the Commissioner at step five require frequent fine motor manipulation of the hands, including reaching, handling, and fingering.  See Docket No. 18 at pp. 7-8.

In the brief filed in support of its motion to affirm the ALJ's decision, the Commissioner argues Ms. G.S. has not met her burden to show her CTS and neuropathy were severe impairments at step two.  See Docket No. 22 at p. 7. The Commissioner asserts the ALJ properly relied upon the objective medical evidence, which did not show that Ms. G.S. experienced any work-related limitations due to her CTS and neuropathy—a showing necessary for a finding of severe impairment.  20 C.F.R. §§ 416.920(c), 416.922(a).  The Commissioner asserts the evidence presented by Ms. G.S.—which the Commissioner characterizes as merely a diagnosis and subjective complaints—is insufficient to show a severe impairment at step two.  The Commissioner also asserts the ALJ referenced several medical records showing Ms. G.S. had good hand functioning consistent with full ability to reach, thereby explaining why the ALJ found these impairments non-severe.  The Commissioner also argues that the

37

ALJ found Ms. G.S.'s complaints of hand problems were not credible in light of notations in the medical record.  As to harmless error, the Commissioner argues that any error was harmless because the ALJ proceeded past step two in the sequential analysis.  See Johnson v. Comm'r of Soc. Sec., Civil No. 11-cv-1268 (JRT/SER), 2012 WL 4328413, at *21 (D. Minn. July 11, 2012) ("[T]he failure to find additional impairments at Step Two does not constitute reversible error when an ALJ considers all of a claimant's impairments in the remaining steps of a disability determination.").

In reply, Ms. G.S. argues that, while it is the ALJ's job to weigh the evidence, the ALJ may not substitute its opinion for that of a medical source. See Combs v. Berryhill, 878 F.3d 642, 647 (8th Cir. 2017).  For the reasons stated herein, the court agrees with Ms. G.S.  The ALJ improperly interpreted the medical evidence in finding Ms. G.S.'s CTS and right ulnar neuropathy do not significantly affect her ability to perform basic work activities, and remand is required.

First, Ms. G.S. asserts the Commissioner's arguments are improper *post hoc* revisions of the ALJ's decision and its articulated bases which the court cannot consider because the ALJ did not raise them in its decision.  This argument is known as the Chenery doctrine, named for SEC v. Chenery Corp., 318 U.S. 80, 87-88 (1943).  Under this doctrine, the Commissioner cannot generate on appeal new rationales for the ALJ's conclusion.

In Chenery, the Supreme Court held that when a court is reviewing an agency decision, the reviewing court is limited to examining agency action on

"the grounds upon which the Commission itself based its action." <u>Id.</u> at 88. The Eighth Circuit has interpreted <u>Chenery</u> to stand for the premise that "a reviewing court may not uphold an agency decision based on reasons not articulated by the agency[] when the agency has failed to make a necessary determination of fact or policy upon which the court's alternative basis is premised." <u>Banks v. Massanari</u>, 258 F.3d 820, 824 (8th Cir. 2001) (quotation and brackets omitted).  <u>See also</u> <u>Michigan v. EPA</u>, 576 U.S. 743, 758 (2015) (stating it is a "foundational principle of administrative law that a court may uphold agency action only on the grounds that the agency invoked when it took the action."). "<u>Chenery</u> demands that an ALJ provid[e] reasoning behind his determination of fact or policy so that a reviewing court can perform the requisite judicial review." <u>Nills v. Saul</u>, No. 5:18-CV-05079-KES, 2019 WL 6078643, at *5 (D.S.D. Nov. 15, 2019).

Here, the ALJ's discussion of CTS and ulnar neuropathy at step two was limited to the following:

> The claimant has been diagnosed with hypertension, carpal tunnel syndrome that is moderately severe in the right hand and mild on the left, [and] right ulnar neuropathy at the elbow.  (Ex. 20F, p.7).[8]  These impairments, considered singly and in combination with the claimant's other impairments, do not cause more than minimal impact on the claimant's ability to carry out work-related activities. Therefore, they are non-severe.

T107.

---

[8] T1285.

Ms. G.S. asserts the Commissioner's argument that the ALJ did not find these impairments severe because it did not find her testimony about hand problems, along with her subjective complaints to medical providers about hand problems, credible is an impermissible *post hoc* rationalization because the ALJ did not reference this as a reason for finding Ms. G.S.'s CTS and ulnar neuropathy impairments non-severe.  See Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69 (1962) ("The courts may not accept appellate counsel's *post hoc* rationalizations for agency action; Chenery requires that an agency's discretionary order [may] be upheld, if at all, on the same basis articulated in the order by the agency itself.").

In Burlington Truck Lines, the Supreme Court addressed a similar issue. The Court noted the Administrative Procedures Act allows courts to determine whether agencies have properly exercised their discretion within the bounds expressed by the legislative delegation of power.  Id. at 167-68.  In order for courts to make this determination, the agency must "disclose the basis of its order."  Id. at 168.  "The agency must make findings and support its decision, and those findings must be supported by substantial evidence."  Id.  Where the agency did not express a particular rationale for its decision, and counsel on appeal supplied a rationale, the Court rejected counsel's *post hoc* rationale because it was never expressed by the agency in its decision.  Id.

Although Ms. G.S. does not raise Chenery as to the Commissioner's arguments that the ALJ found CTS and neuropathy to be non-severe impairments at step two because the objective medical evidence showed that

40

Ms. G.S. had good hand functioning, normal strength, and no abnormalities in the upper extremities, <u>Chenery</u> applies.  While the ALJ, as the Commissioner points out, referenced medical examinations from October 2017, March 2018, and May 2018 at step four, nowhere in that discussion did the ALJ reference any medical findings related to hand functioning generally or CTS and ulnar neuropathy specifically.  Instead, the ALJ discussed other medical findings from those records.  The same is true for the State agency physicians' opinions from May 2017 and December 2017, which found that there was no medical evidence of limitations caused by Ms. G.S.'s hands.  Although the ALJ briefly referenced these opinions at step four, that analysis contained no discussion of those physicians' opinions as they relate to Ms. G.S.'s hand strength, functioning, or CTS and ulnar neuropathy.  Thus, even taking the ALJ's decision as a whole, there is no narrative discussion of the CTS and neuropathy impairments—or any medical findings related to them—to illuminate the ALJ's finding that those impairments are non-severe at step two.

Nowhere in its decision did the ALJ explain its step two findings as to Ms. G.S.'s CTS and ulnar neuropathy impairments in the terms offered by the Commissioner in this appeal.  Therefore, the Commissioner's arguments that the ALJ found those impairments non-severe at step two because (1) it discredited Ms. G.S.'s testimony and (2) the objective medical evidence referenced at step four indicated Ms. G.S. suffered from no upper extremity abnormalities are *post hoc* rationales supplied for the first time herein. Accordingly, the court rejects them.

41

The issue remains, however, whether the ALJ's designating Ms. G.S.'s CTS and ulnar neuropathy as non-severe impairments is otherwise supported by substantial evidence in the record.  Ms. G.S. has stated several grounds in support of her argument that it was not.  First, she asserts the ALJ did not adequately explain how the findings that CTS and ulnar neuropathy were non-severe impairments were supported by substantial evidence in the record.  The standard Ms. G.S. asserts the ALJ fell short of is SSR 96-8p, 1996 WL 374184 (July 2, 1996), which requires that the ALJ must engage in a "narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).  Id. at *7.  However, the Ruling makes clear that this requirement applies to the RFC at step four, not finding severe impairments at step two.  Therefore, Ms. G.S.'s assertion that the ALJ erred by failing to give a narrative discussion of the objective medical evidence according to SSR 96-8p at step two is unpersuasive.

Next, Ms. G.S. argues that the ALJ improperly assumed the role of medical source by interpreting the results of the nerve conduction study that accompanied the CTS and ulnar neuropathy diagnoses.  Specifically, Ms. G.S. asserts the ALJ erred by concluding the results of the neurological study, which showed Ms. G.S.'s CTS was moderately severe on the right and mild on the left, meant these impairments do not cause more than a minimal impact on Ms. G.S.'s ability to do basic work activities *without considering the opinions of any medical sources on the issue.*  This, Ms. G.S. asserts, amounts to a failure

42

to fully and fairly develop the record because there were no medical records available which established or addressed whether the CTS and ulnar neuropathy presented any work limitations, information necessary for the determination of whether those impairments were severe or not at step two.

While "[t]he interpretation of physicians' findings is a factual matter left to the ALJ's authority" (Mabry v. Colvin, 815 F.3d 386, 891 (8th Cir. 2016)), it is well-established that an ALJ "may not draw upon [its] own inferences from medical reports." Shontos v. Barnhart, 328 F.3d 418, 427 (8th Cir. 2003) (quoting Lund v. Weinberger, 520 F.2d 782, 785 (8th Cir. 1975)). "Further, when there is no medical evidence in the record, the ALJ cannot simply make something up." Everson v. Colvin, No. CIV 12-4114, 2013 WL 5175916, at *20 (D.S.D. Sept. 13, 2013). That is, "[a]n ALJ must not substitute [its] own judgment for a physician's opinion without relying on other medical evidence or authority in the record." Id. (quoting Clifford v. Apfel, 227 F.3d 863, 870 (7th Cir. 2000); see also Larson v. Saul, No. 4:18-CV-04121-VLD, 2019 WL 3823929, at *22 (D.S.D. Aug. 15, 2019) (applying requirement that ALJs may not interpret the meaning of medical records to the determination that an impairment was severe at step two).

Moreover, although the burden to show CTS and ulnar neuropathy are severe impairments was on Ms. G.S. at step two, that burden was not great and any doubt as to whether she met it must be resolved in her favor. Caviness, 250 F.3d at 605; Dewald, 590 F. Supp. 2d at 1199. And in non-adversarial SSA proceedings, the ALJ must develop the record fairly and fully;

43

this responsibility is separate from the claimant's burden to show severe impairments at step two.  Stormo, 377 F.3d at 806; Nevland v. Apfel, 204 F.3d 853, 857-58 (8th Cir. 2000) (remanding where ALJ made inferences about the functional limitations caused by impairments found at step two without support from medical evidence).  See also Sunderman v. Colvin, No. 4:16-CV-04003-KES, 2017 WL 473834, at *5 (D.S.D. Feb. 3, 2017) (applying the burden to fairly and fully develop the record to impairments found at step two).

Here, there is no evidence in the record indicating what impact Ms. G.S.'s CTS and ulnar neuropathy have on her ability to work.  Ms. G.S.'s claim was initially denied on June 15, 2017.  T203.  On May 12, 2017, Dr. Kevin Whittle reviewed Ms. G.S.'s claim on behalf of the State agency and concluded that, although Ms. G.S. complained of hand cramping, there was no medical evidence of impairment to her hands.  T181.

Ms. G.S.'s claim was denied on reconsideration on December 5, 2017. T207.  On December 4, 2017, Dr. Kevin Barker reviewed Ms. G.S.'s claim on behalf of the State agency.  T197.  Dr. Barker, like Dr. Whittle, noted that Ms. G.S. complained of hand cramping but that there was no medical evidence of impairment to her hands in the records.  Id.

Indeed, there *was* no medical evidence of impairment to her hands until March 22, 2018, when Ms. G.S. was examined by neurologist Dr. Zimprich. Dr. Zimprich performed nerve conduction studies and diagnosed Ms. G.S. with CTS, moderately severe in the right and mild in the left, and mild ulnar

neuropathy at or near the elbow.  T1282, 1284.  Dr. Zimprich's notes included

the following symptomology:

> [Ms. G.S.] has tingling in the volar and dorsal aspects of her
> wrists and a sense of numbness in the palmar aspects of the
> hands.  These paresthesias tend to be exacerbated with
> activity [and] improved with rest.  They are not particularly
> provoked by driving, however.  She has been dropping
> objects out of her hand but she is uncertain as to the reason
> of it.  She notes no clear upper extremity weakness. . . .  She
> cannot invoke the hand paresthesias of the head or neck
> position change.  Her hands do not change color when they
> are especially bothering her peer [sic].

T1286.

There are no medical source opinions or records in the administrative

record that interpret the work-related effects related to Ms. G.S.'s diagnoses of

mild CTS on the left, moderately severe CTS on the right, and mild right ulnar

neuropathy at or near the elbow.  T1282.  Indeed, the Commissioner concedes

"[t]here is no indication that [Dr. Zimprich] was using 'severe' the way the SSA

uses 'severe' " in diagnosing Ms. G.S. with moderately severe CTS on the right.

See Docket No. 22 at p. 7 n.5.  That is, the Commissioner recognizes that

Dr. Zimprich's diagnosis was not a medical opinion as to Ms. G.S.'s ability to

perform basic work activities.  The ALJ acknowledged these findings at step

two, but never explained how it arrived at the conclusion that they do not

significantly limit Ms. G.S.'s ability to do basic work activities.  Based on its

review of the record, the court concludes there was not medical evidence

showing what effects, if any, Ms. G.S.'s CTS and ulnar neuropathy had on her

ability to perform basic work functions.  Without such medical evidence, the

ALJ improperly drew its own inferences from the medical records to conclude that these impairments were non-severe.

The Commissioner resists this outcome, arguing that this case is analogous to Collins ex rel. Williams v. Barnhart, 335 F.3d 726, 730-31 (8th Cir. 2003), and the bare fact that Dr. Zimprich diagnosed Ms. G.S. with CTS and ulnar neuropathy is only minimally persuasive.  But Collins dealt with the issue of whether a diagnosis of a disorder alone is sufficient proof that the claimant's impairments met or equaled a listing at step three.  Collins is inapposite to the issue here, namely whether it is error for an ALJ to find that diagnosed impairments are not severe, i.e., they do not significantly affect the claimant's ability to work, in the absence of medical evidence that supports such a finding.  While a diagnosis of a listed impairment is insufficient, standing alone, to establish disability, the Commissioner has not directed the court to any authority that states an ALJ may find diagnosed impairments do not significantly affect a claimant's ability to perform basic work activities when there is no medical evidence related to the effects of those impairments in the record.

The Eighth Circuit recently reaffirmed the principle that ALJs may not rely on their own interpretations of medical records when determining functional limitations in Combs v. Berryhill, 878 F.3d 642, 647 (8th Cir. 2017). Although the issue in Combs was whether the ALJ relied on its own interpretations of medical records when determining RFC at step four, the Eighth's Circuit holding applies to the step-two determination of an

46

impairment's effects on the claimant's ability to perform basic work functions. The step-two assessment of an impairment's severity is ultimately an assessment of the functional limitations caused by that impairment.  See Baker v. Colvin, 620 Fed. App'x 550, 557 (8th Cir. 2015) (citing Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007)) ("At Step Two, a claimant has the burden of providing evidence of functional limitations in support of his contention that he is disabled.").  In Combs, the claimant sought judicial review of the Commissioner's denial of benefits.  Combs, 878 F.3d at 643.  She alleged disability based upon the combined effects of rheumatoid arthritis, osteoarthritis, asthma, and obesity.  Id.  The district court affirmed the ALJ's denial of her application for disability.  Id.  The Eighth Circuit reversed, concluding the ALJ had failed to fully and fairly develop the record.  Id.

At the hearing level of the administrative proceedings, Ms. Combs presented medical records containing treatment notes spanning the relevant time frame.  Id. at 644.  Some of those records indicated she was in "no acute distress" and that she showed "normal movement of all extremities."  Id.  None of the physicians who made these notes, however, ultimately offered an opinion about Ms. Combs' functional abilities.  Id.  Instead, the only medical source opinions from which the ALJ had to choose when the time came to formulate Ms. Combs' RFC were State agency physicians who had never treated or examined Ms. Combs.  Id.

One of the State agency physicians opined Ms. Combs was capable of only sedentary work; the other opined she could work at the light duty level.

47

Id. at 644-45.  The ALJ credited the opinion of the State agency physician who opined Ms. Combs could work at the light duty level.  Id. at 645.  In doing so, the ALJ found Ms. Combs' subjective complaints "not entirely credible" and rated the second State agency physician's opinions as more consistent with the record as a whole.  Id.  The ALJ made these findings by interpreting the notations in Ms. Combs' medical records—specifically finding that she was in "no acute distress" and had "normal movement of all extremities" to be more consistent with light duty abilities.  Id.  Ms. Combs asserted the ALJ committed error, because the ALJ gave greater weight to the second State agency physician by relying on the ALJ's own interpretations of the meanings of "no acute distress" and "normal movement of all extremities" rather than contacting her medical providers for clarification as to how those notations affected her physical abilities.  Id. at 646.  The court agreed.

The Eighth Circuit began by acknowledging the ALJ's responsibility to develop the record fully and fairly, independent of the claimant's burden to press her own case.  Id. at 646-47 (citing Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010)).  The ALJ does not have to seek clarifying statements from a treating physician unless a crucial issue is underdeveloped.  Id. (citing Vossen, 612 F.3d at 1016).  But the ALJ is prohibited from substituting its own opinion for those of a physician.  Id. (citing Finch v. Astrue, 547 F.3d 933, 938 (8th Cir. 2008)).

The court concluded the ALJ erred by relying on its own inferences as to the relevance of the notations "no acute distress" and "normal movements of all

48

extremities" when deciding the relative weight to assign to the State agency physicians' opinions. <u>Combs</u>, 878 F.3d at 647. The Commissioner in its brief conceded that "no acute distress" was not particularly significant with regard to Ms. Combs' conditions but argued that "normal movements of all extremities" was inconsistent with Ms. Combs' pain complaints—and that this was an interpretation the ALJ should have been allowed to make. <u>Id.</u> at 647. But the court disagreed and found the relevance of this medical note in terms of Ms. Combs' ability to function in the workplace was not clear. <u>Id.</u> Though the notation was consistently made in the medical records, her medical providers at the same time consistently diagnosed her with rheumatoid arthritis, prescribed medications for severe pain, and noted her pain that was associated with the normal range of motion. <u>Id.</u> Therefore, the court noted, by relying on its own interpretation of the phrases "no acute distress" and "normal movement of all extremities" as to its relevance to Ms. Combs' RFC, the ALJ failed to satisfy its duty to fully and fairly develop the record. <u>Id.</u> (citing <u>Byes v. Astrue</u>, 687 F.3d 913, 915-16 (8th Cir. 2012) ("Failing to develop the record is reversible error when it does not contain enough evidence to determine the impact of a claimant's impairment on her ability to work.")). The court instructed that remand was necessary so the ALJ could inquire as to the relevance of the entries in Ms. Combs' physicians' records upon her ability to function in the workplace. <u>Combs</u>, 878 F.3d at 647.

Here, no medical records addressed what effect, if any, CTS and right ulnar neuropathy have on Ms. G.S.'s ability to work. Yet, the ALJ apparently

relied on its own interpretation of the relevance of "mild [CTS] on the left," " moderately severe [CTS] on the right," and "mild right ulnar neuropathy" (T1292) to answer the question of whether these impairments are severe.  In the absence of such records, the ALJ's drawing of inferences about Ms. G.S.'s ability to perform basic work activities without support from medical evidence was improper.  And this issue is crucial.  As Ms. G.S. notes, each of the jobs the Commissioner identified at step five require prolonged fine motor manipulation of the hands, movements Ms. G.S. is potentially limited in making over the course of a workday depending upon the functional limitations associated with her CTS and ulnar neuropathy.  Therefore, the ALJ failed to fairly and fully develop the record as to a crucial issue and, instead, improperly interpreted the meaning of the medical records as to the effects of Ms. G.S.'s CTS and ulnar neuropathy impairments on her ability to work.  The ALJ, in its independent duty to fairly and fully develop the record, should have sought a medical opinion addressing the work-related limitations caused by these impairments before determining that they do not significantly affect Ms. G.S.'s ability to perform basic work activities at step two.

Yet, the Eighth Circuit has found that reversal for failure to develop the record is warranted only when it is unfair to or prejudices the claimant.  Haley v. Massanari, 258 F.3d 742, 750 (8th Cir. 2001).  Courts within the Eighth Circuit—including in cases cited by the Commissioner—have held that, even when there is an error at step two, that error is harmless if the subsequent steps of the sequential analysis include functional limitations attributable to all

impairments, both severe and non-severe.  See David G. v. Berryhill, No. 17-cv-3671 (HB), 2018 WL 4572981, at *4 (D. Minn. Sept. 24, 2018); Farbush v. Colvin, No. 4:14-cv-00019-SPM, 2015 WL 1299249, at *7 (E.D. Mo. Mar. 23, 2015).  Johnson v. Comm'r of Soc. Sec., Civil No. 11-cv-1268 (JRT/SER), 2012 WL 4328413, at *21 (D. Minn. July 11, 2012) ("[T]he failure to find additional impairments at Step Two does not constitute reversible error when an ALJ considers all of a claimant's impairments in the remaining steps of a disability determination.").  See also Swartz v. Barnhart, 188 Fed. App'x 361, 368 (6th Cir. 2006).

Ms. G.S. cites Nicola v. Astrue, 480 F.3d 885, 886-87 (8th Cir. 2007), for the proposition that the failure to identify a severe impairment at step two is not harmless error but is instead grounds for reversal.  In Nicola, the severe impairment the claimant alleged the ALJ failed to identify was borderline intellectual functioning.  Id. at 887.  The Eighth Circuit noted such a diagnosis should be considered severe when it is supported by sufficient medical evidence.  Id.  The court held the ALJ's failure to identify the impairment as severe was not harmless error.  Id.  The court reversed and remanded the case to the Commissioner for further proceedings.  Id.

As noted in Lund v. Colvin, Civ. No. 13-113 (JSM), 2014 WL 1153508, at *26 (D. Minn. Mar. 21, 2014), the district courts within the Eighth Circuit have disagreed about the holding in Nicola.  Some courts have interpreted it to mean that an ALJ's erroneous step-two failure to include an impairment as severe warrants reversal and remand, even when the ALJ found other impairments to

be severe and therefore continued the sequential analysis.  Id.  Other courts have declined to interpret Nicola as establishing a *per se* rule that any error at step two is reversible error, so long as the ALJ continues with the sequential analysis.  Id. (gathering cases).  The central theme in the cases which hold reversal is not required is that "an error at Step Two may be harmless where the ALJ considers all of the claimant's impairments in the evaluation of the claimant's RFC."  Lund, 2014 WL 1153508, at *26 (quotation omitted).

More recently, this district has interpreted Nicola to require reversal for failure to properly identify a severe impairment at step two when that impairment is diagnosed and properly supported by sufficient medical evidence.  See Quinn v. Berryhill, No. 4:17-CV-04013-KES, 2018 WL 1401807, at *5-6 (D.S.D. Mar. 20, 2018) (error at step two not harmless where ALJ failed to identify medically determinable impairments) (Wyman v. Berryhill, No. 4:17-CV-04174-VLD, 2018 WL 4016614, at *19-20 (D.S.D. Aug. 22, 2018) (applying the interpretation of Nicola from Quinn to case where the alleged error at step two was classifying a medically determinable impairment non-severe instead of severe).

Here, although the ALJ identified Ms. G.S.'s CTS and ulnar neuropathy as impairments, there is no medical evidence in the records indicating how, if at all, these impairments affect Ms. G.S.'s ability to perform basic work activities.  And the ALJ did not address CTS and right ulnar neuropathy in the RFC at step four.  The RFC included no manipulative limitations on Ms. G.S.'s hands, e.g., for reaching, handling, or fingering.  Because the ALJ's own

analysis deemed Ms. G.S.'s CTS and ulnar neuropathy medically determinable impairments, the ALJ was required to consider the functional effects of those impairments when formulating the RFC.  Because these impairments were not mentioned at all in the RFC, it is impossible to determine whether any limitation within the RFC was attributed to them.  Thus, it is not clear whether the ALJ considered all of Ms. G.S.'s impairments in the remainder of the sequential analysis, and the court cannot say that any error at step two was harmless.

The Commissioner also cites <u>Byes v. Astrue</u>, 687 F.3d 913, 917 (8th Cir. 2012), for the proposition that any error was harmless because Ms. G.S. has not shown that that the ALJ would have decided differently if the error had not occurred.  But Ms. G.S. has shown some indication that the ALJ would have decided differently if her CTS and ulnar neuropathy impairments had been linked to significant limitations to her ability to work.  Namely, Ms. G.S. has noted that the jobs the Commissioner identified at step five—bench assembler, electronics worker, and molding machine tender—all require prolonged manipulation and dexterity of the hands.  If the ALJ had found significant effects upon her ability to work caused by CTS and ulnar neuropathy, there is some indication that the Commissioner would have found that Ms. G.S. could not perform the identified jobs.  Therefore, the Commissioner's error at step two was not harmless and it prejudiced Ms. G.S.

On this record, it was not harmless error for the ALJ to determine CTS and ulnar neuropathy were non-severe impairments at step two without

53

support from medical evidence about how those impairments affect Ms. G.S.'s ability to perform basic work activities.  Accordingly, remand is required so that the ALJ may seek a medical source opinion clarifying what effects, if any, CTS and ulnar neuropathy have on Ms. G.S.'s ability to perform basic work functions.  After receiving such a medical source opinion, the Commissioner shall evaluate whether these impairments are severe or not at step two.

### 2.  Whether the Commissioner's Determination of Ms. G.S.'s RFC Is Supported by Substantial Evidence

In order to complete step four, the Commissioner must determine the claimant's RFC, which is the most the claimant can do despite the claimant's mental and physical limitations.  Brown v. Barnhart, 390 F.3d 535, 538-39 (8th Cir. 2004); 20 C.F.R. § 416.945(a)(1).  The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians, and the claimant's own description of their limitations.  Lacroix v. Barnhart, 465 F.3d 881, 887 (8th Cir. 2006).  The ALJ's RFC finding "must be supported by medical evidence that addresses the claimant's ability to function in the workplace."  Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003) (citation omitted).

Residual functional capacity is "defined as what the claimant can still do despite his or her physical or mental limitations."  Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001) (citations omitted, punctuation altered).  The RFC assessment is an indication of what the claimant can do on a "regular and continuing basis" given the claimant's disability.  20 C.F.R. § 416.945(b) & (c). The formulation of the RFC has been described as "probably the most

important issue" in a Social Security case.  McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc), abrogation on other grounds recognized in Higgins v. Apfel, 222 F.3d 504, 505 (8th Cir. 2000).

When determining RFC, the ALJ must consider all of a claimant's mental and physical impairments in combination, including those impairments that are severe and those that are non-severe.  Lauer, 245 F.3d at 703; SSR 96-8p, 1996 WL 374184, at *5.  Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence . . . a claimant's residual functional capacity is a medical question." Lauer, 245 F.3d at 704 (citations omitted).  Therefore, "[s]ome medical evidence . . . must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace."  Id. (citations omitted).  Relevant evidence includes: medical history; medical signs and laboratory findings; the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication); reports of daily activities; lay evidence; recorded observations; medical source statements; effects of symptoms, including pain, that are reasonably attributable to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations.  See SSR 96-8p, 1996 WL 374184, at *5.

"The RFC assessment must always consider and address medical source opinions."  Id. at *7.  If the ALJ's assessment of RFC conflicts with the opinion

of a medical source, the ALJ "must explain why the opinion was not adopted." Id.

Ultimate issues such as RFC, "disabled," or "unable to work" are issues reserved to the ALJ. Id. at n.8. Medical source opinions on these ultimate issues must still be considered by the ALJ in making these determinations. Id.

"When there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity." Id. at *1. However, the ALJ must "make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." Id. at *5.

When writing the RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence . . . . In assessing RFC, the adjudicator must . . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." Id. at *7.

Finally, "to find that a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Reed v. Barnhart, 399 F.3d 917, 923 (8th Cir. 2005) (quotation omitted, punctuation altered). RFC is not demonstrated by "the ability merely to lift weights occasionally in a doctor's office." Juszczyk

v. Astrue, 542 F.3d 626, 633 (8th Cir. 2008) (quotation omitted).  See also SSR 96-8p, 1996 WL 374184, at *1 ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule.").

> ### a.   Whether the ALJ Erred in Formulating Ms. G.S.'s Mental RFC
>
> #### i.   Recap of the Administrative Record Related to Mental Impairments

The records show Ms. G.S. was attending counseling sessions at the Flandreau Counseling Center as early as July 14, 2015, approximately ten months after the alleged date of disability.  On that date, Ms. G.S. was seen by Patricia Iron Shell-Hill, Ph.D., at the Rosebud Comprehensive Health Care Facility for mental health crisis counseling after the death of her brother. T535.  Dr. Iron Shell-Hill gave Ms. G.S. the option to continue counseling at her discretion.  T537.

Ms. G.S. saw Dr. Iron Shell-Hill again on July 30, 2015, for mental health counseling.  T533.  There are no mental health treatment records for the following 10 months.

On May 25, 2016, Ms. G.S. was seen by Rae Burnett at the Flandreau Santee Sioux Tribe Health Clinic for an initial counseling session.  T667. Ms. Burnett noted that Ms. G.S.'s affect was sad and her mood depressed. T667.  Ms. Burnett referred Ms. G.S. to Dr. Pavlis and recommended that she continue weekly therapy and journal.  T668.

On June 16, 2016, Ms. G.S. was seen by Ms. Burnett at the Flandreau Clinic for counseling services.  T664.  Ms. Burnett recommended weekly therapy and journaling for Ms. G.S.  T665.

On June 22, 2016, Ms. G.S. was seen by Ms. Burnett at the Flandreau Clinic for counseling services.  T662.  Ms. Burnett recommended weekly therapy, journaling, and drawing for Ms. G.S.  T663.  Ms. Burnett noted that a call was placed to the pharmacy after it was discovered that Ms. G.S. had not called to have any of the prescriptions refilled.  T663.

On June 30, 2016, Ms. G.S. was seen by Dr. Pavlis at the Flandreau Clinic for psychiatry.  T659.  Dr. Pavlis found she was experiencing severe anxiety and diagnosed her with PTSD.  T660-61.  Dr. Pavlis prescribed citalopram for depression and recommended that Ms. G.S. continue psychotherapy with Ms. Burnett.  T661.  There are no mental health treatment records for the following approximately nine months.

On February 28, 2017, Ms. G.S. went to the Flandreau Clinic, where she was seen by P.A. Drago.  T900.  P.A. Drago continued Ms. G.S.'s prescription for citalopram.  T902.

On July 12, 2017, Ms. G.S. asked N.P. McMillan to restart citalopram for depression and PTSD and to begin counseling.  T915.  N.P. McMillan restarted citalopram and referred Ms. G.S. to a counselor.  T917.  Ms. G.S. saw a counselor, Ms. Williams, on July 17, 2017.  T919-20.  Ms. Williams noted that Ms. G.S. would contact the clinic to schedule her next counseling session.  T920.

On November 29, 2017, Ms. G.S. was transferred Rosebud ER to the Rapid City Hospital for a psychiatric evaluation after her counselor sent her to the ER over concerns of suicidal tendencies.  T73.  Ms. G.S. reported feeling suicidal thoughts for approximately one year and noted her medical conditions, a death in the family, and a stressful living situation.  T73.  Examination revealed suicidal ideas and depressed mood.  T73.  Ms. G.S. was admitted to the hospital and discharged on December 2, 2017.  T79, 92.  Examination on November 30 revealed Ms. G.S. to be crying and exhibiting psychomotor retardation, a dysphoric and depressed mood, constricted affect, passive suicidal ideation, vegetative symptoms of hopelessness, decreased interest and concentration, and fair insight, judgment, and intelligence.  T86.  Ms. G.S.'s diagnoses included major depression recurrent moderate and pain disorder with physical and psychological characteristics.  T87.  Ms. G.S. was prescribed Cymbalta (a brand of duloxetine) starting on December 2, 2017, (T87), and citalopram was discontinued (T364).

On February 13, 2018, Ms. G.S. saw N.P. McMillan, and her prescription for Cymbalta was continued .  T1320.  On that date, N.P. McMillan worked with Ms. G.S. on a plan to restart counseling.  T1320.

Ms. G.S. saw neurologist Dr. Zimprich on March 22, 2018.  T1284. Dr. Zimprich noted that Ms. G.S. was taking duloxetine for depression and was trying to see a psychiatrist due to thoughts of self-harm.  T1288.  Dr. Zimprich considered whether Ms. G.S.'s depression was magnifying her headache and pain symptoms.  T1284.

On May 29, 2018, Ms. G.S. was seen by N.P. McMillan, who noted Ms. G.S.'s depressed mood.  T1326.  N.P. McMillan encouraged Ms. G.S. to stop using marijuana because it is a natural depressant and probably exacerbated her symptoms.  T1327.  N.P. McMillan continued duloxetine for depression.  T1327.  Ms. G.S. saw Ms. Williams for counseling the same day. T1329.  Ms. Williams noted that the neurology examination noted that Ms. G.S. may be experiencing increased anxiety and depression.  T1329.  Ms. Williams noted that Ms. G.S.'s chronic pain could be causing depressive episodes, low energy, and problems focusing.  T1329.

Ms. G.S. saw Ms. Williams for counseling again on June 5, 2018.  T1331. Ms. G.S. expressed frustration with her living situation and stated that she could not attend physical therapy as frequently as recommended because she relied on her daughter for gas money, but her daughter believed the appointments were unnecessary.  T1331.  Ms. G.S. appeared anxious with low mood.  T1331  Ms. G.S. stated she could not have another session for seven weeks but, if she could find housing in Flandreau, she could follow up more regularly.  T1332.  Ms. Williams noted that Ms. G.S. met the criteria for major depressive disorder, recurrent, moderate to severe.

Ms. G.S. saw N.P. McMillan on November 13, 2018.  T1344.  Ms. G.S. reported depression and anxiety, and N.P. McMillan encouraged Ms. G.S. to resume counseling.  T1348.  N.P. McMillan noted that Ms. G.S.'s previous counseling session had to be cancelled, but the cancellation was not Ms. G.S.'s fault.  T1348.  N.P. McMillan continued duloxetine for depression.  T1348.

60

These treatment records demonstrate a long-standing problem with depression for Ms. G.S.  However, there were several periods of time where Ms. G.S. neither complained of symptoms nor sought treatment.

### ii.  Mental Limitations Incorporated in the RFC

Ms. G.S. asserts the ALJ erred in determining her mental RFC.  The RFC determined by the ALJ is quoted in full on pages four and five, above.  Important to this issue is the ALJ's determination at step two that Ms. G.S. had severe impairments of major depressive disorder and post-traumatic stress syndrome.  The only mental limitations in Ms. G.S.'s RFC are that she is limited to simple tasks, that she can maintain concentration, persistence, and pace for two hours at a time, and that she is limited to brief and superficial interactions with co-workers and the general public.  T109.  The heart of the issue is whether these limitations adequately express the functional limitations caused by Ms. G.S.'s mental impairments.

Ms. G.S. argues the ALJ failed to base the mental RFC on substantial evidence after rejecting all medical evidence as to the effects of her mental impairments on her ability to function and, instead, made its own inferences about the functional impact of her mental impairments.  Ms. G.S. also argues the ALJ failed to incorporate the moderate limitations in concentration, persistence or pace, with no mention of limited attention span, difficulty completing tasks, or staying on pace as mentioned in the ALJ's analysis at step three.  Lastly, Ms. G.S. asserts the ALJ erred by emphasizing the sporadic nature of her mental health treatment without considering the possible reasons

why she did not comply with or seek treatment in a manner consistent with her complaints.

The administrative record contains opinions as to mental RFC from two State agency psychologists and from Ms. Williams.  The State agency psychologist on initial review opined Ms. G.S. had no severe mental impairments, but had non-severe trauma and stressor-related disorders, and depressive, bipolar, and related disorders that caused mild limitations in her ability to understand, remember, and apply information, interact with others, concentrate, persist, or maintain pace, and adapt or manage herself.  T177-78. The State agency psychologist on review made essentially the same findings in November 2017.  T193-94.  The ALJ gave these opinions little weight, finding that Ms. G.S.'s mental impairments were severe and noting that although she had not been consistent in her treatment, Ms. G.S. had some deficits and she was taking psychiatric medications.

Ms. G.S.'s treating therapist, Ms. Williams, completed a medical source statement on October 30, 2018, regarding Ms. G.S.'s ability to perform work-related mental activities on a sustained basis.  T1351.  Ms. Williams stated Ms. G.S. would have marked limitations if she attempted sustained work in her ability to understand and remember complex instructions; carry out complex instructions; and make judgments on complex work-related decisions.  T1351. Ms. Williams stated Ms. G.S. would have moderate limitations if she attempted sustained work in her ability to make judgments on simple work-related decisions; and in her ability to respond appropriately to usual work situations

62

and changes, and Ms. G.S. had other mild work limitations in her abilities to interact appropriately with the public, supervisors, and co-workers.  T1351-52.  Ms. Williams opined Ms. G.S. was mildly limited in her abilities to understand, remember, and carry out simple instructions.  T1351.  Ms. Williams explained that Ms. G.S. had major depression prior to her chronic pain and, now that the depression had increased, specifically noted problems with problem solving, rigid behaviors, blunted affect, feelings of worthlessness, slowed thought, distortions of failure and undue fear/preoccupation with having MS.  T1352.  Ms. Williams stated her opinions were supported by clinical interviews in conjunction with medical reports, Ms. G.S.'s grief/loss of physical and mental abilities, and chronic fatigue due to poor sleep.  T1352.  Ms. Williams also opined Ms. G.S.'s thought was slowed by these impairments and these impairments caused a distorted sense of failure and heightened depression-related "symptoms of somatizing" in the preceding year.  T1351.

Ms. G.S. asserts the ALJ erred by (1) failing to explain what "partial weight" with regard to Ms. Williams' opinion means and (2) giving only partial weight to Ms. William's opinion although the RFC's limitation to simple tasks is consistent with Ms. Williams' opinion.

Ms. G.S.'s first assertion, that the ALJ erred by failing to explain what "partial weight" meant, is a nonstarter.  The ALJ gave partial weight to Ms. Williams' opinion, stating the marked limitations noted by Ms. Williams were "inconsistent with [Ms. G.S.'s] relatively intact activities of daily living and sporadic mental health treatment."  T113.  Immediately preceding this

63

conclusion, the ALJ summarized Ms. William's opinion: "Ms. Williams stated the claimant had moderate to marked limitations in understanding, remembering and following instructions[.]"  T113.  This is the only reference to a "marked" limitation in this section about Ms. William's opinion.  The only "marked" limitations contained in Ms. Williams' opinion were to Ms. G.S.'s ability to understand, remember, and carry out complex instructions and to make judgments on complex work-related decisions.  T1351.  Clearly these were the marked limitations the ALJ rejected, and the rejection of these marked limitations was clearly what the ALJ meant when it gave Ms. Williams' opinion only partial weight.  This explanation is adequate because it allows the court to follow the ALJ's reasoning about why it gave Ms. Williams' opinion only partial weight.  See 20 C.F.R. § 416.927(f)(2) ("The adjudicator generally should explain the weight given to opinions from [non-acceptable medical sources] or otherwise ensure that the discussion of the evidence in the . . . decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning[.]").

Ms. G.S. also argues the ALJ's limitation in Ms. G.S.'s mental RFC to simple tasks is actually consistent with Ms. Williams' opinion that Ms. G.S. had marked difficulty in all capacities related to complex work-related tasks, and is therefore internally inconsistent with the ALJ's assignment of only partial weight to Ms. Williams' opinion.  Deficiencies in an ALJ's decision do not require remand when the deficiency had no bearing on the outcome.  See Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008) ("[A]n arguable deficiency in opinion-writing technique does not require us to set aside an administrative

finding when that deficiency had no bearing on the outcome." (internal quotations omitted)).  Here, Ms. G.S. has not shown that she was prejudiced by the ALJ's alleged error in drafting the RFC to limit her to only simple tasks while still rejecting the marked limitations found by Ms. Williams.  Without a showing of harm, the court must conclude ALJ's alleged error was harmless and remand is not warranted.

Next, Ms. G.S. asserts this case is analogous to Ruff v. Berryhill, No. 4:18-CV-04057-VLD, 2019 WL 267478 (D.S.D. Jan. 18, 2019), and this record contains no medical opinions that support the ALJ's RFC determination. Ms. G.S.'s assertion muddies the water as to what record evidence must support the ALJ's RFC determination; it is not medical *opinion* evidence, but medical evidence of the claimant's ability to function in the workplace, that controls.  In Ruff, this court ordered remand to reevaluate the claimant's mental RFC where the ALJ failed to support the RFC with any medical evidence.  Id. at *31.  The ALJ in Ruff gave no weight to the State agency psychologist's opinion and little weight to opinions from the claimant's treating therapist.  Id. at *29-30.

Here, as discussed fully above, the ALJ gave partial weight to the opinion from Ms. Williams, Ms. G.S.'s treating therapist, and little weight to the State agency psychologists' opinions.  While Ms. G.S. makes much of the fact that the ALJ in Ruff did not give any of the opinions controlling—or even partial— weight, this court did not order remand on that basis.  Instead, this court ordered remand because the ALJ in Ruff failed to clearly explain what medical

evidence—not which medical opinion—supported its mental RFC.  Ruff, 2019
WL 267478, at *31.

      "An ALJ determines a claimant's RFC 'based on all the relevant evidence,
including the medical records, observations of treating physicians and others,
and an individual's own descriptions of [her] limitations.' "  Combs, 878 F.3d at
646 (quoting Strongson v. Barnhart, 361 F.3d 1066, 1070 (8th Cir. 2004)).  Yet,
"[b]ecause a claimant's RFC is a medical question, an ALJ's assessment of it
must be supported by some medical evidence of the claimant's ability to
function in the workplace."  Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007).
"However, there is no requirement that an RFC finding be supported by a
specific medical opinion."  Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016)
(citing Myers v. Colvin, 721 F.3d 521, 526-27 (8th Cir. 2013) (affirming RFC
without medical opinion evidence); Perks v. Astrue, 687 F.3d 1086, 1092-93
(8th Cir. 2012) (same)).

      In any case, Ruff is distinguishable because in this case the ALJ did not
completely dismiss the functional limitations stated by Ms. Williams.  Instead,
the ALJ only rejected Ms. Williams' conclusion that Ms. G.S. had marked
limitations related to complex instructions and complex work-related decision.
In light of the evidence discussed by the ALJ in its decision, the ALJ was
entitled to discredit Ms. Williams' opinion as to the marked limitations.

      Here, the ALJ engaged in a relatively detailed review of Ms. G.S.'s mental
health treatment history.  T112-13.  The ALJ discussed treatment records from
May 2016 (T667), July 2017 (T915, 919, 920), September 2017 (T939),

December 2017,[9] May 2018 (T1326-27, 1329-30), June 2018 (T1331), August
2018 (T1341), November 2018 (T1344, 1347).  The parties quibble about the
level of detail in which the ALJ discussed each of these records.  But the fact
remains that the ALJ clearly discussed the medical evidence underlying its
decision to accept Ms. Williams' opinion partially—as opposed to wholly: "the
mental health status examinations and the claimant's sporadic mental health
treatment support a finding of no more than moderate limitations in the
'paragraph B' criteria" (T112)[10] as opposed to the marked limitations opined by
Ms. Williams.  The ALJ found that Ms. G.S. was no more than moderately
impaired based upon the medical records it cited.  Therefore, unlike in Ruff,
the ALJ here properly explained how the medical evidence supported its mental
RFC limitation to simple tasks, especially those elements of the RFC that
deviated from Ms. William's opinion.  Ms. G.S.'s assertion that the ALJ erred by
failing to explain how it determined her mental RFC limitation to simple tasks
is without merit because the ALJ articulated the link between the impairments

---

[9] Here, the ALJ cited Exhibit 10F at p. 13.  Exhibit 10F is a four-page record
dated May 11, 2017.  T888-91.  It seems the ALJ meant to cite Exhibit 19F at
p. 13.  That record is dated December 14, 2017, and reflects that Ms. G.S. was
recently discharged from Rapid City Regional Hospital due to "Depression
Exacerbation (suicidal tendencies)."  T1146.  This is a harmless drafting error.

[10] To satisfy paragraph B criteria, a claimant must have at least one extreme
limitation in one of the four categories of work-related functions, or two marked
limitations in two categories.  Listings § 12.00(A)2b, (E) – (F).  A "marked
limitation" is defined as "functioning in an area independently, appropriately,
effectively, and on a sustained basis is seriously limited."  Id. at (F)2d.  A
"moderate limitation" is defined as "functioning in an area independently,
appropriately, effectively, and on a sustained basis is fair."  Id. at (F)2c.

of depressive disorder and PTSD and their effects on her ability to function in the workplace.

Next, Ms. G.S. argues <u>Ruff</u> supports the finding that remand is required because the ALJ did not adequately address all of the limitations found at step three, namely moderate limitations in Ms. G.S.'s ability to maintain concentration, persistence, and pace. In <u>Ruff</u>, the only mental limitation in Ms. Ruff's RFC was that she must perform simple, routine, and repetitive tasks. <u>Id.</u> at *28. Yet, the ALJ found moderate limitations in concentrating, persisting, and maintaining pace at step three. <u>Id.</u> at *31. This court acknowledged that the RFC failed to explain why the limitations found at step three did not translate into functional limitations at step four, but noted that a limitation to simple, repetitive, and routine tasks can adequately take into account a claimant's moderate limitations in concentration, persistence, and maintaining pace. <u>Id.</u> (citing <u>Howard v. Massanari</u>, 255 F.3d 577, 582 (8th Cir. 2001); <u>Ge Xiong v. Colvin</u>, 995 F. Supp. 2d 958, 988 (D. Minn. 2014)). <u>Ruff</u> was distinguishable from those cases, where the limitations were based on medical opinion evidence, because the ALJ did not explain how the medical evidence—opinion or otherwise—supported its formulation of Ms. Ruff's mental RFC. <u>Id.</u> Accordingly, remand was required. <u>Id.</u>

Here, the ALJ found that Ms. G.S. has the RFC to perform simple tasks and that she can maintain concentration, persistence, and pace for two-hour segments. The two-hour segments limitation accounts for the ALJ's finding at step three than Ms. G.S. is moderately limited in concentrating, persisting, or

68

maintaining pace.  T108.  Thus, even though an ALJ's findings at step three do not automatically require an RFC limitation at step four, the ALJ clearly included these limitations in the RFC.  Therefore, this case is distinguishable from Ruff, where there was no RFC limitation associated with concentration, persistence, or pace whatsoever.  Moreover, as this court noted in Ruff, and as the Commissioner notes in its brief, there is ample authority establishing that a limitation to simple tasks adequately accounts for deficiencies in concentration, persistence, and pace.  See Howard, 255 F.3d at 582; Ge Xiong, 995 F. Supp. 2d at 988; Scott v. Berryhill, 855 F.3d 853, 857-58 (8th Cir. 2017) (finding limitation to "medium, unskilled work" limited in complexity to "tasks [that] can be learned and performed by rote" adequately accounted for limitations in concentration, persistence, or pace).

Yet, Ms. G.S. makes the argument that the ALJ, in forming the limitation as to concentration, persistence, and pace, did not adequately explain how it formed that limitation.  Part of this argument involves Ruff, where the court ordered remand because the ALJ did not sufficiently explain its RFC with medical evidence.  Ms. G.S. asserts this case is analogous to Ruff because the court "ha[s] to guess at what the ALJ relied upon in arriving at [Ms. G.S.'s] mental RFC."  See Docket No. 18 at p. 12.

Here, the ALJ repeatedly noted Ms. G.S.'s subjective complaints of limited attention and trouble concentrating, but the ALJ did not explain what medical evidence supported its RFC finding of a limitation to concentration, persistence, and pace.  There is no requirement that an ALJ follow each RFC

69

limitation with a list of specific, supporting evidence.  Bradley v. Colvin, No. 3:14-05052-DGK-SSA, 2015 WL 2365607, at *3 (W.D. Mo. May 18, 2015) (citing SSR 96-8p).  Yet, even if the ALJ does not provide a narrative discussion immediately following each individual limitation in the RFC, the reviewing court must be able to otherwise discern the elements of the ALJ's decision-making. Jennings v. Colvin, No. 4:13-cv-00073 JCH, 2014 WL 2968796, at *14 (E.D. Mo. July 1, 2014) (citing Depover v. Barnhart, 349 F.3d 563, 567-68 (8th Cir. 2003)).  See also Lauer, 245 F.3d at 705-06 (8th Cir. 2001) (remand where ALJ's decision unclear as to the medical basis for the RFC assessment); Wilfong v. Berryhill, No. 4:17-cv-2747-SNLJ, 2018 WL 4489453, at *4 (E.D. Mo. Sept. 19, 2018) ("Whether or not Wilfong desires the ALJ to format her opinion to explicitly match each RFC limitation to the supporting evidence, there is nothing contained within SSR 96-8p to require such an undertaking—SSR 96-8p requires only that the evidence, both medical and non-medical, be discussed in a way that would support each conclusion, not that each conclusion must be individually discussed and independently supported."). Although RFC is an administrative determination based on all the record evidence (20 C.F.R. § 416.946(a)), "the record must include some medical evidence that supports the ALJ's [RFC] finding."  Dykes v. Apfel, 223 F.3d 865, 866-67 (8th Cir. 2000).  See also Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) ("[I]n evaluating a claimant's RFC, an ALJ is not limited to considering medical evidence exclusively.").

The ALJ discussed Ms. G.S.'s subjective complaints, pre-hearing and at the hearing, of limited attention span and difficulties concentrating and paying attention.  The ALJ, at step three, noted that Ms. G.S. stated she had limited attention span in the function report, but that the treatment notes documented that she had normal attention.  T108.  Ms. Williams' opinion, which the ALJ rejected only as to marked limitations to Ms. G.S.'s ability to perform complex tasks, indicated no limitation whatsoever to concentration, persistence, or pace.  T1351-53.

In addition to the evidence of limitations to concentration, persistence, or maintaining pace cited by the ALJ in its decision, the record contains medical evidence of these limitations.  In June 2016, Dr. Pavlis at the Flandreau Clinic noted that Ms. G.S. presented with impaired concentration.  T659, 660.  When she was seen by neurology in March 2018, Ms. G.S. was noted to have impaired concentration, and examination revealed she needed frequent redirection and prompting when relating her history.  T1286.  Thus, the record includes medical evidence that supports the ALJ's RFC finding, and the ALJ's RFC finding about Ms. G.S.'s limitations to concentration, persistence or pace is supported by substantial evidence.  Remand is not warranted on this issue.

Next, the court examines Ms. G.S.'s final contention about the RFC limitation to her concentration, persistence, or pace.  Ms. G.S. argues the two-hour segment limitation is no limitation at all and does not adequately address the moderate limitations to concentration, persistence, and maintaining pace found at step three.  This is because, as Ms. G.S. argues, a standard workday

is already broken up into four two-hour segments by a mid-morning break, lunch, and an afternoon break.

As the Commissioner notes, Ms. G.S. has not asserted that the ALJ should have found she needed more frequent breaks or that she needed greater limitations.  Error must be prejudicial to justify remanding the ALJ's opinion. Lacroix, 465 F.3d at 886; Samons v. Astrue, 497 F.3d 813, 822 (8th Cir. 2007) (holding remand not appropriate, even when ALJ erred, unless that error prejudiced claimant).  Without a showing of prejudice or unfairness, this alleged error was harmless.  Remand is not warranted on this issue.

Lastly, Ms. G.S. asserts the ALJ erred by discussing Ms. G.S.'s "sporadic" mental health treatment multiple times without considering possible reasons why she did not seek treatment consistent with the degree of her complaints. The ALJ cited Ms. G.S.'s "sporadic" mental health treatment as a reason for partially discounting Ms. Williams' opinion (T113), finding Ms. G.S. was no more than moderately limited in the paragraph B criteria (T112), and for determining the mental RFC (T114).  SSR 16-3p offers guidance to ALJs in evaluating the frequency or extent of treatment sought by a claimant:

> [I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record.  *We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints.*  We may need to contact the individual regarding the lack of treatment or, at an

> administrative proceeding, ask why he or she has not
> complied with or sought treatment in a manner consistent
> with his or her complaints.

Id., 2017 WL 5180304, at *9 (Oct. 25, 2017) (emphasis added).  One such

reason the Ruling contemplates is that "[a]n individual may not be able to

afford treatment and may not have access to free or low-cost medical services."

Id. at *10.

Ms. G.S. asserts the ALJ erred by failing to explore why she did not seek

mental health treatment more frequently.  Ms. G.S. alludes that the ALJ should

have inquired further at the administrative hearing why she did not seek more

frequent mental health treatment.  But SSR 16-3p *suggests*, but does not

require, that ALJs directly inquire of claimants why they did not seek treatment

more frequently; it *requires* ALJs to "consider[] possible reasons he or she may

not comply with treatment or seek treatment consistent with the degree of his

or her complaints."  Id.  SSR 16-3p also requires the Commissioner to "explain

how [it] considered the individual's reasons in our evaluation of the individual's

symptoms."  Id.  Accordingly, the court considers (1) whether the ALJ

considered reasons why Ms. G.S.'s mental health treatment was at times

"sporadic" before drawing that inference against the alleged intensity and

persistence of Ms. G.S.'s symptoms and (2) if the ALJ explained how it

considered Ms. G.S.'s reasons in evaluating her symptoms.

Here, the ALJ asked Ms. G.S. if she had medical insurance.  T130.

Ms. G.S. stated that she did not, and she noted that she had to travel to

Flandreau for her diabetes clinicals.  T130.  When they were discussing

Ms. G.S.'s treatment for knee pain, Ms. G.S. told the ALJ that providers at the Wagner Indian Health Service Clinic had recommended her for a knee replacement, but that she could not get the operation because she would have to be living "down there," i.e., near Wagner on the Yankton Reservation, to be referred for the surgery. T139-40. The ALJ asked Ms. G.S. if she received care in Brookings, South Dakota, where she was living at the time of the hearing, and Ms. G.S. said she did not have insurance to cover the care. T140. When they were discussing Ms. G.S.'s treatment for back pain, Ms. G.S. told the ALJ that she could not get treatment because she was not living on the reservation. T141. The ALJ asked Ms. G.S. if she had access to a community clinic or free clinic where she was living or "[a]nything else in [her] area to try to get some care." T141. Ms. G.S. answered, "No," because she had to be living on the reservation, and she told the ALJ that when a person is living on the reservation, they are referred out for care. T141-42. But Ms. G.S. was living in Brookings, where she could not access these services and where she had no insurance. T142. Ms. G.S. stated she tried to get care in Brookings, but they told her she would have to return to the Rosebud Reservation to get care or to be referred to another doctor. T142. The ALJ asked Ms. G.S. if she could go to a free clinic in Brookings, and Ms. G.S. said that no one gave her any information about such a clinic. T142. Ms. G.S. clarified that she would have to reside on the reservation in order for the tribe to refer her to treatment for her pain issues. T142. Ms. G.S. told the ALJ that her primary care provider had been N.P. McMillan at the Flandreau clinic since she moved to Brookings.

74

T142.  Ms. G.S. told the ALJ she would have to find a place to live in Moody County—where Flandreau is located—to receive more care.  T143.  The ALJ and Ms. G.S. discussed that her mental health providers, including Ms. Williams, saw Ms. G.S. at the Flandreau clinic.  T152-53.  There was no additional testimony about any impediments specific to Ms. G.S.'s obtaining mental health treatment.

While it is true the ALJ did not reference every record that mentions Ms. G.S.'s difficulty obtaining medical care due to where she lives or prohibitive cost, it is clear the ALJ considered these factors in determining her RFC.  In its opinion, the ALJ noted that Ms. G.S. had access to care through the Indian Health Service, she would have to move to a certain reservation to qualify for care, and that it did not appear she had tried to obtain care through other means.  T110, 113.  This reference, together with the above-referenced hearing testimony about the availability of free or community healthcare off the reservation generally and in Brookings specifically, shows that the ALJ considered the availability of free or low-cost healthcare to Ms. G.S. when assessing her mental health treatment history.

Yet, the availability of free or low-cost healthcare near where Ms. G.S. lived is not the only reason why Ms. G.S.'s mental health treatment may have been infrequent.  SSR 16-3p requires the Commissioner to "consider and address reasons for not pursuing treatment that are pertinent to an individual's case."  SSR 16-3p, 2017 WL 5180304, at *10.  The Commissioner must also "review the case record to determine whether there are explanations

for inconsistencies in the individual's statements about symptoms and their effects." Id.  The record shows that Ms. G.S. may have had trouble attending her healthcare appointments, including counseling with Ms. Williams in Flandreau, because she had to use her daughter's car and relied on her daughter for gas money.  Ms. G.S. told Ms. Williams about this difficulty on May 29, 2018.  T1329.  On June 5, 2018, Ms. G.S. told Ms. Williams that she could not manage twice-weekly physical therapy because she relied on her daughter for gas money, and her daughter believed Ms. G.S.'s medical appointments were unnecessary.  T1331.  The ALJ never mentioned this possible reason for Ms. G.S.'s sometimes infrequent care in its decision, and there is no indication in the record that the ALJ considered it.  Accordingly, remand is warranted so that the ALJ may consider whether this reason explains why Ms. G.S. did not at all times seek treatment consistent with the degree of her complaints.

Further, the ALJ's reference to possible reasons why Ms. G.S.'s medical care was infrequent in its decision falls short of the SSR 16-3p requirement that the Commissioner "explain how [it] considered the individual's reasons in [its] evaluation of the individual's symptoms."  See SSR 16-3p, 2017 WL 5180304, at *10.  Put another way, nowhere in its decision did the ALJ discuss why Ms. G.S.'s sometimes infrequent healthcare treatment was not explained away by the lack of affordable healthcare in Brookings and that Ms. G.S. had to travel to the reservation for healthcare referrals.  Instead of offering any analysis of these explanations, the ALJ's decision referenced them only in

descriptive terms.  Accordingly, remand is warranted for the ALJ to explain how it considered Ms. G.S.'s reasons for sometimes infrequent healthcare in its evaluation of her symptoms.  See Hayes-Jackson v. Colvin, No. 2:15-CV-315-JEM, 2016 WL 5439872, at *6-7 (N.D. Ind. Sept. 29, 2016) (citing O'Connor-Spinner v. Astrue, 627 F.3d 614, 618 (7th Cir. 2010)) (although ALJ elicited testimony that plaintiff's non-compliance with treatment might have been related to one of her severe impairments, remand warranted for ALJ's failure to explain why this reason was unconvincing or not supported by objective evidence).

The Commissioner in response asserts Ms. G.S. has not presented sufficient evidence to support a finding that there were impediments to her mental health treatment.  In support, the Commissioner discusses Ms. G.S.'s June 2018 counseling session with Ms. Williams, where Ms. G.S. stated she could not have another session at the Flandreau Clinic for seven weeks unless she relocated to Flandreau.  T1332.  Yet, in July and August 2018, Ms. G.S. traveled to Flandreau for treatment, but not mental health treatment. T1333-42.  While the Commissioner accurately represents the record, the ALJ did not offer this explanation for discrediting Ms. G.S.'s allegation that she could not obtain mental health treatment more frequently.  Therefore, this assertion is an improper *post hoc* rationalization, and it runs afoul of Chenery. The court does not consider it.

### b.   Whether the ALJ Erred in Formulating Ms. G.S.'s Physical RFC

Ms. G.S. argues the ALJ erred in determining her physical RFC, which is quoted on pages four and five, above.  First, Ms. G.S. asserts the ALJ erred when it failed to discuss her CTS and right ulnar neuropathy.  The court has already ordered remand so that the ALJ can return to step two of the sequential assessment and determine whether Ms. G.S.'s CTS and right ulnar neuropathy are medically determinable severe impairments in light of medical evidence of their affect, if any, on Ms. G.S.'s ability to perform basic work activities.  See supra section D.1.

Ms. G.S. raises the related argument that the ALJ erred by failing to consider the non-severe impairments of CTS and ulnar neuropathy at step four.  It is clear from the absence of any reference to these impairments, together with the complete lack of any restrictions related to the hands, that the ALJ did not consider these impairments at step four.  There is no automatic requirement that an ALJ must discuss every impairment, severe or not, found at step two in the RFC at step four.  Gann v. Colvin, 92 F. Supp. 3d 857, 884 (N.D. Iowa 2015).  However, impairments found at step two or step three, whether severe or not, should be considered by the ALJ when formulating the RFC at step four.  Id.  The key question in whether an impairment found at step two or step three is included in the RFC is whether there is substantial evidence that the impairment actually limits the claimant's ability to work.  Id. at 885 (quoting Taylor v. Astrue, Civil Action No. BPG-11-0032, 2012 WL 294532, at *8 (D. Md. Jan. 31, 2012)).  The court has already

ordered remand for failure to develop the record related to the work-related effects of Ms. G.S.'s CTS and ulnar neuropathy.  If, after considering medical evidence related the work-related effects of these impairments, the ALJ still considers them non-severe, the ALJ should return to step four to reassess Ms. G.S.'s physical RFC based upon all the impairments, be they severe or not, that limit Ms. G.S.'s ability to function in the workplace.  See Thurston v. Colvin, CIV. 15-5024-JLV, 2016 WL 5400359, at *5 (D.S.D. Sept. 27, 2016) ("[F]ailure to consider plaintiff's limitations . . . infect[s] the ALJ's . . . further analysis under step four.") (quoting Spicer v. Barnhart, 64 Fed. App'x 173, 178 (10th Cir. 2003)).  Accordingly, remand is warranted so that the ALJ can return to step four to determine Ms. G.S.'s physical RFC based upon the severe and non-severe impairments it finds at step two.

Ms. G.S. also asserts the ALJ erred by failing to reconcile conflicts between opinions from the State agency medical consultants and the RFC.  The Commissioner offers no argument in response.  SSR 96-8p requires that, "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."  SSR 96-8p, 1996 WL 374184, at *7.

The State agency medical consultant at the initial level reviewed Ms. G.S.'s file on May 12, 2017.  T181.  The consultant concluded Ms. G.S. had severe impairments of Dysfunction – Major Joints, Obesity, Disorders of Back-Discogenic and Degenerative, and non-severe impairments of hypertension and diabetes.  T177, 181.  The consultant concluded Ms. G.S.

79

was limited to lifting 20 pounds occasionally, 10 pounds frequently, standing

or walking four hours per workday, sitting more than six hours per workday,

occasionally climbing ramps/stairs, ladders/ropes/scaffolds, stooping,

crouching, kneeling, and crawling.  T179-80.  The consultant concluded

Ms. G.S. should avoid even moderate exposure to hazards such as machinery

and heights.  T181.  The State agency medical consultant at the

reconsideration level made essentially identical findings on December 5, 2017.

T192, 195-97.

The ALJ found Ms. G.S. was limited to, in relevant part, "lift[ing] and/or

carry[ing] 20 pounds occasionally and 10 pounds frequently," "sit[ting] for

about 6 hours in an 8-hour workday," "stand[ing] and/or walk[ing] combined

for about 6 hours in an 8-hour workday," "never climb[ing] ladders, ropes, or

scaffolds," "occasionally climb[ing] ramps and stairs using a handrail,"

"occasionally balanc[ing], kneel[ing] and crawl[ing]," and that Ms. G.S. should

have no exposure to hazards and heights.  T109.  The ALJ also found that

Ms. G.S. needs the opportunity to stand up and/or change position at her

workstation for approximately two to three minutes after sitting for one hour.

Then, Ms. G.S. can return to a seated position and continue in that fashion for

the remainder of the workday.  T109.

As a preliminary matter, Ms. G.S. asserts the sit/stand accommodation

is internally inconsistent because carrying on an entire workday sitting for one

hour then standing for up to three minutes would cause Ms. G.S. to, in

aggregate, sit longer than the "about" six-hour sitting limitation contained in

the RFC.  The Commissioner characterizes Ms. G.S.'s argument as "convoluted."  The court disagrees; the argument is straight-forward.

Yet, inconsistency within the RFC does not itself constitute reversible error.  Error must be prejudicial to justify remanding the ALJ's opinion. Lacroix, 465 F.3d at 886; Samons, 497 F.3d at 821-22.  Here, Ms. G.S. has not shown that she was prejudiced by the ALJ's alleged error in drafting the time allotments of the sit/stand accommodation.  Without a showing of harm, the court must conclude the ALJ's error in calculating the time allotments of the sit/stand accommodation was harmless and remand is not warranted on this issue.

Next, Ms. G.S. alleges the ALJ erred by failing to reconcile the differences between the RFC it found at step four and the medical source opinions in the record.  The RFC fashioned by the ALJ conflicts with the State agency consultants' recommendations on the issues of how long Ms. G.S. can stand in a workday and how frequently Ms. G.S. can climb ladders, ropes, or scaffolds in a workday.

The ALJ evaluated the State agency medical consultants' opinions as follows:

> After reviewing the medical evidence of record, the State agency medical consultants determined the claimant was capable of performing a range of light work activity.  (Ex. 2A, pp. 8-10; 4A, pp. 11-13).[11]  The undersigned accepts that the claimant is capable of working a range of light work activity. However, the undersigned finds that evidence admitted at the hearing level has shown the claimant was more limited

---

[11] T179-81, 195-97.

than originally determined with the need for a sit/stand option secondary to chronic back and knee pain.  (Ex. 9F; 13F; 14F; 16F; 22F).[12]  Therefore, the undersigned affords the State agency medical consultants' assessments some weight to the extent they support the physical residual functional capacity assessments as set forth above.

T113-14.

The ALJ did not discuss why the medical opinions from the State agency consultants were not adopted.  Instead, the ALJ merely stated that evidence admitted at the hearing level, i.e., evidence that was not available to the State agency consultants, showed that Ms. G.S. was more limited than the medical consultants opined.  But the ALJ did not explain how the voluminous medical records it cited showed that Ms. G.S.'s limitations were greater than those opined by the State medical consultants or which medical findings within those records were inconsistent with the State consultants' opinions.  The ALJ's discussion of these medical opinions offers little more than the conclusion that they are consistent with the RFC to the extent they are consistent with the RFC.  This falls short of the requirement that the ALJ must explain why a medical opinion was not adopted.  See Reindl v. Astrue, No. 09 C 2695,

---

[12] Exhibit 9F consists of 49 pages of office treatment records from the Wagner Indian Health Center dated November 10, 2016, to May 10, 2017.  T839-87. Exhibit 13F consists of 40 pages of office treatment records from the Flandreau Clinic dated August 30, 2016, to September 12, 2017.  T896-935.  Exhibit 14F consists of 83 pages of office treatment records from the Rosebud Hospital dated October 4, 2017, to October 5, 2017.  T936-1018.  Exhibit 16F consists of a nine-page radiology report from the Cherry County Hospital dated October 18, 2017.  T1111-19.  Exhibit 22F consists of 37 pages of office treatment records from the Flandreau Clinic dated July 17, 2017, to November 13, 2018. T1314-50.

2010 WL 2893611, at *10, 12 (N.D. Ill. July 22, 2010) (ALJ's giving medical opinion little weight to "the extent that the opinion is inconsistent with the stated [RFC]" and not offering reasons for rejecting the opinion was error). Therefore, the ALJ's decision to afford some weight to these medical opinions without explaining why they did not adequately account for Ms. G.S.'s limitations was error. Remand is warranted so that the Commissioner can clarify why the State agency medical consultants' opinions were not adopted.

Next, Ms. G.S. asserts the ALJ erred by crafting a sit/stand alternative that is not supported by any medical evidence. The RFC determined by the ALJ provides that Ms. G.S. would need the opportunity to stand up and/or change position at her workstation for two or three minutes after sitting for an hour, then return to sitting and continue in that manner the rest of the workday. The ALJ explained that this position-changing accommodation was needed because Ms. G.S.'s "chronic back and knee conditions reasonably limit her to a range of light work activity with the need to alternate positions." T111. The ALJ did not cite any medical evidence for this proposition. The ALJ also stated that, "[b]ecause of pain and stiffness, [Ms. G.S.] needs an opportunity to stand up after sitting." T112. The ALJ did not cite any medical evidence for this proposition. Finally, the ALJ reasoned that "evidence admitted at the hearing level has shown [Ms. G.S.] was more limited than originally determined [by the State agency medical consultants] with the need for a

sit/stand option secondary to chronic back and knee pain."  T114.  The ALJ cited generally five exhibits in support of this proposition.  These exhibits, which are described in footnote 12 herein, comprise 218 pages of the administrative record.  They contain records spanning from August 30, 2016, to November 13, 2018.

Ms. G.S. argues the ALJ improperly assumed the role of medical expert and made up the sit/stand accommodation with no foundation in the medical evidence.  The Commissioner argues the sit/stand alternative is proper because the ALJ explained what evidence led it to reasonably infer Ms. G.S. needed this accommodation.  The Commissioner's position is meritless.  Although ALJs may properly draw reasonable inferences (e.g., from a claimant's failure to show up for treatment and lack of reported earnings as in Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008)), ALJs "may not simply draw [their] own inferences about plaintiff's functional ability from medical reports." Strongson, 361 F.3d at 1070.  Instead, the "RFC is a medical question, [and] an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." Combs, 878 F.3d at 646 (quoting Steed v. Astrue, 524 F.3d 872, 875 (8th Cir. 2008)).

Although Ms. G.S. argues the ALJ erred by assuming the role of medical expert and fashioning the sit/stand accommodation without support from medical evidence, the ALJ did reference medical reports

84

when it rejected the agency physicians' opinions and noted the need for a sit/stand option; the problem is therefore not that the ALJ assumed the role of medical expert to arrive at the sit/stand accommodation, but that the ALJ did not specify what medical evidence supports that finding. Accordingly, the question before the court is whether the sit/stand accommodation found by the ALJ at step four was adequately supported by medical evidence in the record.

When deciding the RFC, an ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."  SSR 96-8p, 1996 WL 374184, at *7.  "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." Cox, 495 F.3d at 619.  See also Dykes, 223 F.3d at 866-67 ("[T]he record must include some medical evidence that supports the ALJ's [RFC] finding.").  Even if the ALJ does not provide a narrative discussion immediately following each individual limitation in the RFC, the reviewing court must be able to otherwise discern the elements of the ALJ's decision-making.  Jennings, 2014 WL 2968796, at *14 (citing Depover, 349 F.3d at 567-68).

Here, the ALJ cited no specific medical evidence to support its formulation of the sit/stand accommodation.  Its citation to 218 pages of the medical record does not allow the court to discern what medical evidence supports the ALJ's determination that Ms. G.S. is limited by the sit/stand

85

accommodation contained in the RFC.  See Lauer, 245 F.3d at 705-06 (8th Cir. 2001) (remand where ALJ's decision unclear as to the medical basis for the RFC assessment).  The court will not guess what medical evidence, if any, contained in those exhibits supports the ALJ's formulation of the sit/stand accommodation.  Therefore, remand is warranted for clarification on the issue of what medical evidence supports the ALJ's determination of the sit/stand accommodation in the RFC.  On remand, the ALJ should not draw its own inferences about Ms. G.S.'s functional ability from the medical records. Strongson, 361 F.3d at 1070

The Commissioner resists, arguing that, despite the lack of citations to specific medical records supporting the sit/stand accommodation in the RFC, benefit inured to Ms. G.S. because this accommodation narrowed the pool of jobs available to Ms. G.S.  In support, the Commissioner cites Prochaska v. Barnhart, 454 F.3d 731, 736-37 (7th Cir. 2006), Partee v. Astrue, 638 F.3d 860, 863 (8th Cir. 2011), and Hamer v. Colvin, No. 4:14 CV 1371 JMB, 2015 WL 6750820, at *8 (E.D. Mo. Nov. 5, 2015).  The Commissioner offers no explanation why it cites Prochaska, and it seems to cite Partee only because it is an Eighth Circuit case that treats Prochaska favorably.

In Prochaska, the Seventh Circuit affirmed the ALJ's RFC formulation in the face of the claimant's contention that the ALJ did not consider her obesity in connection with her other impairments when formulating the RFC.  454 F.3d at 736.  The Seventh Circuit found that the ALJ *had* considered the claimant's obesity in formulating the RFC as shown through its review and discussion of

her doctors' reports, which did factor in her weight.  Id. at 737.  This is irrelevant to the issue here, namely whether the ALJ erred by determining an RFC limitation that is not supported by any medical evidence in the record. Here, none of the medical reports considered by the ALJ include an impairment or, more pointedly, a functional limitation requiring the sit/stand accommodation contained in the RFC.  Prochaska is similarly irrelevant to the sub-issue of whether such an error may be harmless if the claimant benefited from it.

Partee has a slightly different holding than Prochaska.  The ALJ in Partee explicitly considered the claimant's obesity.  638 F.3d at 863.  But Partee cited favorably the holding from Prochaska—"when an ALJ adopts the opinion of a doctor aware of an obesity claim, the ALJ's failure to consider the claim explicitly is harmless error."  Partee, 638 F.3d at 863 (citing Prochaska, 454 F.3d at 736-37).

First, Ms. G.S.'s case is not even in the realm of Prochaska because the ALJ here explicitly considered her obesity.  The ALJ found obesity was a severe impairment at step two and discussed it at step four.  And it is not even that Ms. G.S. is claiming that the ALJ erred by failing to consider an *impairment or claim of impairment* that was considered by medical sources but not explicitly considered by the ALJ, as was the case in Prochaska.  Instead, Ms. G.S. has claimed that the ALJ erred by inadequately supporting a functional limitation contained in the RFC with medical evidence.  These two claims are distinct, and Porchaska and Partee have no bearing on this case.

87

Hamer, although more relevant to the issues in this case, is also distinguishable.  In Hamer, one of the record medical opinions limited the claimant to sedentary work but indicated that the claimant retained some capabilities consistent with a medium level of exertion.  2015 WL 6750820, at *8.  The ALJ gave this opinion great weight and limited the claimant to sedentary work.  Id.  The claimant, on appeal, argued that the ALJ's determination of her RFC was not supported by substantial evidence because it was inconsistent with the medical opinion as to medium-exertion abilities.  Id.  The court found that "the fact that the ALJ ultimately imposed greater limitations on Plaintiff's RFC [than those contained in the medical source's opinion] resulted in no prejudice to Plaintiff."  Id.

Facially, this appears applicable to this case.  Here, the ALJ imposed a greater limitation—the sit/stand accommodation—than what was recommended in the medical opinion evidence.  However, the Hamer court's rationale for so finding reveals a fundamental difference from the facts of this case.  In Hamer, the court reasoned that "the fact that the ALJ relied on an opinion that included fewer restrictions on Plaintiff's RFC [than the ALJ found at step four] amounts to no more than a harmless error in opinion writing technique."  Id.  Thus, the issue in Hamer was whether the ALJ erred by determining an RFC that was consistent with one part of a medical source's opinion but inconsistent with the other—but there was no question that the ALJ's formulation of the RFC was supported by the medical evidence.  Because the ALJ's RFC was consistent with the part of the medical evidence that

supported greater functional limitations on the claimant, thereby making the Commissioner's work at step five harder, any error was harmless.

Here, the issue is not whether the ALJ erred by formulating an RFC that is consistent with some medical evidence but is inconsistent with other medical evidence; the issue is whether the ALJ's formulation of the sit/stand accommodation is supported by the medical evidence at all.  In Hamer, it was clear what medical evidence the ALJ relied on in determining the RFC.  Here, it is not.  Accordingly, Hamer is distinguishable, and the court cannot say whether it was harmless error for the ALJ to provide an unclear explanation of what medical evidence supports the sit/stand accommodation.  Therefore, remand is warranted for clarification of this issue.

### 3.   Whether the Commissioner Carried Its Burden at Step Five To Identify Jobs Ms. G.S. Could Perform Based on Substantial Evidence

Ms. G.S. alleges the ALJ erred at step five in determining the number of jobs available in the national economy.  The VE testified Ms. G.S. could do the jobs of bench assembler (DOT code 706.687-010), electronics worker (DOT code 726.687-010), and molding machine tender (DOT code 556.685-022).  T164.  The VE testified there were 400,000, 200,000, and 80,000 of each of these jobs, respectively, available "in the national economy."  Id.

Section 1382c(a)(3) of Title 42 provides in pertinent part as follows:

(A) Except as provided in subparagraph (C), an individual shall be considered to be disabled for purposes of this title [42 U.S.C. §§ 1381 et seq.] if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.

> (B) For purposes of paragraph (A), an individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. *For purposes of the preceding sentence* (with respect to any individual), *"work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.*

See 42 U.S.C. § 1382c(a)(3)(A) & (B) (emphasis added).  See also 20 C.F.R. § 416.966(a) ("We consider that work exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions of the country.").

The Commissioner's rulings state "[w]henever vocational resources are used and the decision is adverse to the claimant, the determination or decision will include: . . . a statement of the incidence of such work in the region in which the individual resides or in several regions of the country."  See SSR 85-15, 1985 WL 56857, at *3 (Jan. 1, 1985).  The purpose of these provisions is so that claimants are not denied benefits on the basis of "[i]solated jobs that exist only in very limited numbers in relatively few locations outside of the region where [they] live."  20 C.F.R. § 416.966(b).  This court, in Porter v. Berryhill, 5:17-CV-05028-VLD, 2018 WL 2138661 (D.S.D. May 9, 2018), found that "at step five, the ALJ must find that jobs the claimant can do exist in substantial numbers in the claimant's own 'region' (something less than the whole nation), or in 'several regions' (several parts that, together, consist of something less

than the whole nation)." Id. at *63.  (ordering remand because VE testified only about jobs available "nationally" and ALJ only considered jobs available nationally at step five).

Here, the VE testified only to the number of jobs available "in the national economy."  T164.  The ALJ considered only the number of jobs available "nationally" at step five.  T115.  Section 1382c(a)(3) and § 416.966 require more specificity than that.  Porter, 2018 WL 2138661, at *64 (finding the same as to the Title II analogues, 42 U.S.C. § 423(d)(2)(A) and 20 C.F.R. § 404.1566).  The burden to find these qualifying jobs is on the Commissioner at step five of the sequential analysis.  Herron v. Shalala, 46 F.3d 45, 47 (8th Cir. 1995).  The law clearly requires the Commissioner to present evidence that jobs Ms. G.S. can perform exist in the national economy by showing that a significant number of those jobs exist in Ms. G.S.'s region or in several other regions of the country.  Therefore, the absence of valid evidence of substantial numbers of jobs in Ms. G.S.'s region or several other regions is an absence of evidence that cuts against the Commissioner.  This court will not hazard guesses about facts that might have been adduced at the agency level, namely whether the jobs the VE identified exist in substantial numbers in the region where Ms. G.S. lives or in several other regions of the country.  The Commissioner's failure of proof requires remand to the agency to further develop these facts at step five.

The Commissioner resists this outcome on several grounds.  First, the Commissioner asserts Ms. G.S.'s interpretation of the VE's testimony about the

number of jobs existing "in the national economy" is a "willful misreading of the expert's testimony." See Docket No. 22 at p. 19-20.  The Commissioner implies that the VE meant "in the national economy" to mean "existing in significant numbers in the region where Ms. G.S. lives or in several other regions of the country"—i.e., the way that term is defined by law—not merely that those numbers represented the number of jobs available nationally.  The court disagrees with the Commissioner.  The Commissioner's argument is purely speculative.  The ALJ's decision, which cites the VE as giving numbers of jobs that exist "nationally" (T115), not number of jobs that exist "in the national economy," greatly undermines the Commissioner's argument.  The ALJ's decision contains no indication of what sort of jobs exist in the region where Ms. G.S. lives or in several other regions of the country.  Without any clear evidence to resolve this apparent ambiguity, the court recalls the applicable burden of proof at step five.  There, the Commissioner bears the burden to identify jobs a claimant can perform that exist in significant numbers in the national economy.  Johnson v. Chater, 108 F.3d 178, 180 (8th Cir. 1997).  Further, regardless of what the VE meant by "in the national economy," the ALJ failed to satisfy SSR 85-15, which requires a statement of the incidence of work found by the vocational resource in the region where Ms. G.S. lives or in several regions of the country.  Id., 1985 WL 56857, at *3.

In light of this ambiguity, the court cannot conclude that the Commissioner met its burden, and remand is warranted for clarification of the issue.  It is not for this court to guess about what evidence may have been

adduced in administrative proceedings or to entertain the parties' speculation about the intentions of the VE.  Remand is required so that the ALJ may return to step five to develop the facts as to whether work Ms. G.S. can perform exists in significant numbers in the national economy as that term is defined by law.

The Commissioner also hints at the argument that Ms. G.S.'s challenge to the Commissioner's step-five finding is improper because she did not question how the VE used the term "in the national economy" or the VE's qualifications at the hearing.  This argument is akin to one alleging forfeiture.  In support of this argument, the Commissioner cites Blake-Norman v. Colvin, No. CV 13-6456-JPR, 2014 WL 6682629, at *8 (C.D. Cal. Nov. 25, 2014), for the proposition that a claimant forfeits challenges to a VE's testimony if the claimant does not raise those issues in the administrative proceeding.  But Blake-Norman dealt with the ALJ's alleged failure to consider whether the claimant's auditory impairment met or equaled a Listing at step three.  Id.  The court reasoned that, even if the ALJ had failed as the claimant alleged, any error would have been harmless because the claimant's attorney did not present limitations to the VE beyond those included in the ALJ's hypothetical.  Id.  But here, the alleged legal error is at step five.  At step five, unlike at step three, the burden was on the Commissioner to present valid evidence of the existence of work Ms. G.S. could perform.  The court will not impose forfeiture on Ms. G.S. because her hearing counsel failed to help the Commissioner meet its burden.  Therefore, Blake-Norman does not support the finding that

Ms. G.S. forfeited her claim not challenging the VE's qualifications or asking what the VE meant by "in the national economy."

The Commissioner also cites <u>Hepp v. Astrue</u>, 511 F.3d 798 (8th Cir. 2008).  In <u>Hepp</u>, the Eighth Circuit affirmed the principle that a disability claimant is entitled to a full and fair hearing under the Social Security Act.  <u>Id.</u> at 804.  The Eighth Circuit recognized that Social Security hearings are non-adversarial and therefore do not require full courtroom procedures.  <u>Id.</u> However, the Eighth Circuit noted that the Supreme Court in <u>Richardson v. Perales</u>, 402 U.S. 389 (1971), held that an adverse medical report may constitute substantial evidence, even if the report's author was not cross-examined, in part because the claimant could have cross-examined the author but did not.  <u>Id.</u> at 404-05.  But <u>Hepp</u> and <u>Perales</u> dealt with challenges to procedural due process under the Fifth Amendment.  <u>Hepp</u>, 511 F.3d at 805; <u>Perales</u>, 402 U.S. at 401-02.

Here, Ms. G.S.'s claim does not sound in procedural due process.  Her claim alleges legal error for the Commissioner's failure to meet its burden at step five.  Therefore, <u>Hepp</u> and <u>Perales</u> do not require forfeiture here because Ms. G.S.'s counsel at the administrative hearing did not challenge the VE's qualifications or ask the VE to clarify his use of "in the national economy."  It was the Commissioner's burden at step five to identify work Ms. G.S. can perform that exists in significant numbers in the national economy as that term is defined by law.  At step five, ambiguities in the evidence cut against the

Commissioner regardless of whether the claimant failed to interrogate those ambiguities at the hearing.

Second, the Commissioner asserts that the proper focus of the Social Security Act is the presence of jobs in the national economy, not regional economies.  See Docket No. 22 at pp. 20-21 (citing Miller v. Finch, 430 F.2d 321, 324 (8th Cir. 1970)).  The court agrees that the proper focus of the Act is the national economy; that is why § 1382c(a)(3)(B) and § 416.966(a) permit the Commissioner to identify jobs in several regions of the country other than the region where the claimant lives.  This does not mean, however, that the Commissioner may shrug its burden to show the existence of jobs in the national economy *as that term is defined by law*.  The law does not require the Commissioner to "show that jobs exist within a reasonable distance from [a] claimant's home and that [a] claimant would be employed if he applied for such jobs."  Miller, 430 F.2d at 324.  But the law does require the Commissioner to show a significant number of jobs in the national economy, meaning jobs that are in the region where the claimant lives or several other regions of the country.  The Commissioner's argument that it does not is tantamount to asking the court to authorize its knowing deviation from the law.  The court rejects this request.

The Commissioner cites several other cases in support of this proposition.  Each citation is misplaced.  The Commissioner cites Whitehouse v. Sullivan, 949 F.2d 1005, 1007 (8th Cir. 1991), for the proposition that "[t]he expert is only required to state his opinion as to the number of jobs available in

95

the national economy."  The issue in <u>Whitehouse</u> was whether the Commissioner failed at step five to show that jobs existed in significant numbers in the national economy which the claimant could perform.  <u>Id.</u> at 1006-07.  But the ground for the claimant's argument was that the job titles from the DOT did not correlate with the job titles from the Job Service statistical summaries.  <u>Id.</u> at 1007.  The VE used DOT code numbers to identify the jobs he believed the claimant could perform but used job titles from the Job Service in response to questions from the ALJ.  <u>Id.</u>  The Eighth Circuit found there was no error because there is no requirement that the VE correlate DOT titles with the Job Service summaries.  <u>Id.</u>  Thus, the material quoted by the Commissioner about the stating the number of jobs in the national economy is merely dicta from the <u>Whitehouse</u> opinion.  And, accepting for sake of argument that the holding in <u>Whitehouse</u> is relevant to the issue in this case, it does not abrogate the § 1382c(a)(3) definition of "work which exists in the national economy," which was in effect when the Eighth Circuit decided <u>Whitehouse</u> in 1991.  The Eighth Circuit's reasoning in <u>Whitehouse</u> would still require the Commissioner to identify jobs that exist in the national economy, *as that term is defined by law*, i.e., by identifying a significant number of jobs that exist in the region where the claimant lives or in several other regions of the country.

Lastly, the Commissioner's use of this <u>Whitehouse</u> dicta is misleading. The Eighth Circuit did not, as the Commission insinuates, reason that "[t]he [VE] is *only* required to state his opinion as to the number of jobs available in

the national economy" (Whitehouse, 949 F.2d at 1007 (emphasis added)) to the exclusion of *also* giving relevant regional job numbers.  Instead, the use of "only" flows from the Eighth Circuit's holding that the VE is *not* required to correlate the DOT titles with the Job Service summaries.  Id.  For these reasons, the Commissioner's citation to Whitehouse is unpersuasive.

The Commissioner also cites Haller v. Astrue, Civil No. 11-2175, 2012 WL 2888801 (W.D. Ark. July 16, 2012), for the proposition that the VE must only opine as to the number of jobs available in the national economy.  In Haller, the VE testified that the region he would be referring to was Arkansas. Id. at *11.  Yet, the ALJ's questions asked only after the number of jobs available in the national economy.  Id.  The court in Haller affirmed the principle that the VE is required to state their opinion as to the number of jobs available in the national economy, not as to jobs available in the immediate area in which the claimant lives.  Id.  Yet, the court credited the VE's consideration of Arkansas as the region where the claimant lived in providing job numbers, and it therefore found that the ALJ's identification of a significant number of jobs in the national economy was supported by substantial evidence.  Id.  Haller is clearly distinguishable from this case.  In Haller, the court did not touch on the issue here, i.e., whether the identification of jobs at step five can be supported by substantial evidence when the ALJ references only jobs available "nationally."  Indeed, the testimony offered by the VE in Haller was clearly an opinion about jobs available in the region where the claimant lived, thereby providing substantial evidence of jobs available in the

national economy as that term is defined by law.  Thus, the Commissioner's citation to Haller does not persuade the court that it did not err when it identified only the incidence of jobs "nationally."

The Commissioner also cites Craig v. Chater, 943 F. Supp. 1184, 1191 (W.D. Mo. 1996), for the proposition that the "Commissioner [is] only required to show jobs in [the] national economy, not in [the] region where plaintiff lives." In Craig, the VE testified to 5,230 jobs in Missouri and 196,500 jobs in the country which the claimant could perform.  Id.  The court affirmed the principle that the Commissioner is required to identify jobs that exist in the national economy, not in the region where the claimant lives.  Id. (citing Janka v. Sec'y of HEW, 589 F.2d 365, 370 (8th Cir. 1978) (holding § 423(d)(2)(A) precludes finding disability if claimant can perform substantial gainful work that exists in the national economy irrespective of whether that work exists in the immediate vicinity)).  This is an accurate statement of the law as regards § 1382c(a)(3) and § 416.966.  The Commissioner is not required to identify work that exists in the immediate area where the claimant lives, or even in the region where the claimant lives; the Commissioner could lawfully identify jobs which the claimant can perform in the national economy by, for instance, identifying jobs that exist in significant numbers in several other regions of the country.  Again, the holding from Craig does not disrupt the fact that the Commissioner at step five was required to identify jobs Ms. G.S. can do and which exist in significant numbers in the national economy *as that term is*

98

*defined by law*.  The court rejects the Commissioner's argument that the ALJ's step-five finding in this case satisfies this requirement.

Third, the Commissioner asserts there was no error because the ALJ identified a larger number of jobs that exist "nationally" than the Eighth Circuit has found significant in other cases.  The Commissioner first cites <u>Johnson v. Chater</u>, 108 F.3d 178 (8th Cir. 1997), in support.  In <u>Johnson</u>, the claimant appealed the issue of whether the VE's testimony was sufficient to prove there were jobs existing in significant numbers in the national economy.  The VE had testified that Johnson could perform sedentary, unskilled work, such as being an addresser or document preparer.  <u>Id.</u> at 179.  The VE said there were 200 such positions in Iowa and 10,000 such positions nationwide.  <u>Id.</u>  Johnson took issue with whether 200 positions in his home state of Iowa constituted a "substantial" numbers of jobs.  <u>Id.</u> at 180 n.3.  The court rejected Mr. Johnson's argument and held that the VE's "testimony was sufficient to show that there exist a significant number of jobs in the economy that Johnson can perform."  <u>Id.</u> at 180.  The facts in <u>Johnson</u> are in stark contrast to the facts of this case.  In <u>Johnson</u>, the VE testified to the number of jobs available in the claimant's region and the number of jobs available nationally.  <u>Id.</u> at 179.

Here, the VE did not testify about the number of jobs available in any particular region, instead testifying only about the number of jobs available "in the national economy."  T164.  And the ALJ identified only jobs available "nationally" at step five.  T115.  Here, unlike in <u>Johnson</u>, there is no evidence

99

of substantial numbers of jobs in the region where Ms. G.S. lives or in several
other regions of the country.  Therefore, the Eighth Circuit's finding in Johnson
that 10,000 jobs in the national economy *and 200 jobs in the claimant's region*
satisfied the Commissioner's burden at step five has no bearing on this case.

The Commissioner also cites Stewart v. Sullivan, No. 89-6242, 1990 WL
75248 (6th Cir. June 6, 1990), for the proposition that courts have considered
as few as 125 jobs in the region where the claimant lives satisfies the
Commissioner's burden at step five.  Id. at *3.  This case is distinguishable for
the same reasons as Johnson.  Because there is no evidence of substantial
numbers of jobs in the region where Ms. G.S. lives or in several other regions of
the country, the Sixth Circuit's finding in Stewart that 400,000 jobs in the
national economy and 125 jobs in the local geographical area where the
claimant lived were significant is irrelevant to this case.

Next, the Commissioner cites Weiler v. Apfel, 179 F.3d 1107, 1111
(8th Cir. 1999), for the proposition that the Commissioner satisfied its burden
to show there are a significant number of jobs in the national economy that
Ms. G.S. could perform because the VE testified to a total of 680,000 jobs
nationally, and that number is greater than the 32,000 jobs nationally found in
Weiler.  In Weiler, the claimant appealed the ALJ's unfavorable decision on the
basis that the ALJ erroneously concluded that there were a significant number
of jobs in the economy the claimant could perform.  179 F.3d at 1110.
Specifically, the claimant asserted the jobs the VE testified to were actually
incompatible with his RFC.  Id.  The Eighth Circuit rejected this argument and,

100

without going into the details of the other three jobs the VE testified about, noted the VE testified that there were 32,000 surveillance monitor jobs in the national economy. Id. at 1111. The other three jobs were deliverer, locker room attendant, and arcade attendant. Id. at 1109.

Contrary to the Commissioner's representation, the Eighth Circuit did not find the 32,000 surveillance monitor jobs to be a significant number of jobs in the economy which the claimant could perform. Instead, in holding that the jobs the VE testified to were compatible with the claimant's RFC, the court found that the VE's testimony—which also included the number of deliverer, locker room attendant, and arcade attendant jobs (id. at 1109)—was substantial evidence of a significant number of jobs in the economy the claimant could perform. Id. at 1111. Thus, not only is the material from Weiler quoted by the Commissioner mere dicta, but also the factual representation the Commissioner made is untrue. Accordingly, the holding in Weiler is irrelevant to the issue of whether the Commissioner failed to meet its burden at step five in this case.

Fourth, the Commissioner asserts that this court should assume, based upon the large number of jobs identified by the VE, that a significant number of them exist in the region where Ms. G.S. lives or in several regions of the country. This is because "it logically follows that this enormous number of jobs encompassed significant numbers of jobs in several reasons." See Docket No. 22 at p. 22. The Commissioner's argument has no basis in law and is contrary to the requirements of the Social Security Act. It was the

101

Commissioner's responsibility at step five to identify jobs Ms. G.S. can perform that exist in significant numbers in the national economy.  Herron, 46 F.3d at 47.  The absence of valid evidence of substantial number of such jobs in Ms. G.S.'s region or in several other regions of the country cuts against the Commissioner.  This failure of proof requires remand to the agency to further develop facts about the existence of qualifying jobs in the national economy as that term is defined by law.

**E.    Type of Remand**

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record.  Ms. G.S. requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative reversal with remand and instructions to reconsider her case.

Section 1383(c)(3) of Title 42 of the United States Code provides that final decisions made by the Commissioner of the Social Security Administration as to Title XVI benefits shall be subject to judicial review under 42 U.S.C. § 405(g). Section 405(g) authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands.  A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision

102

and remands the case in accordance with such ruling.  <u>Buckner v. Apfel</u>, 213 F.3d 1006, 1010 (8th Cir. 2000).  A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings.  <u>Id.</u> Neither sentence six situation applies here.

A sentence four remand is applicable in this case.  Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding."  <u>Buckner</u>, 213 F.3d at 1011.  In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings.  <u>Id.</u>; <u>Cox v. Apfel</u>, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be clarified and properly evaluated.  <u>See also</u> <u>Briscoe ex rel. Taylor v. Barnhart</u>, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability).  Therefore, a remand for further administrative proceedings is appropriate.

## CONCLUSION

Based on the foregoing law, administrative record, and analysis, it is hereby ORDERED that the Commissioner's decision is REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 1383(c)(3) and 42 U.S.C. § 405(g), sentence four.  Ms. G.S.'s motion to remand [Docket No. 17] is GRANTED and the Commissioner's motion to affirm [Docket No. 21] is DENIED.


DATED this 23rd day of April, 2021.

BY THE COURT:

_____
VERONICA L. DUFFY
United States Magistrate Judge